REDWOOD S. S. CO. v. UNITED STATES
SHIPPING BOARD EMERGENCY
FLEET CORPORATION et al. *

(Circuit Court of Appeals, Ninth Circuit.
March 28, 1927.)

No. 4936.

1. Collision ⬷⟾105(2)—Evidence held to fix the
fault for collision between meeting vessels, on
libelant's vessel.

Allegation of a libel that a collision in San
Francisco Bay in the daytime, between two
steam vessels meeting nearly head-on was
caused by a change of course and speed by the
other vessel, *held* not sustained by the evidence,
which tended to show· that it was caused by a
change of course by libelant's vessel just be-
fore collision.

2. Evidence ⬷⟾77(1)—Nonproduction of wit-
nesses to testify on point already adequately
covered raised no presumption that their tes-
timony would be adverse.

Failure to call additional witnesses to a point
already adequately covered does not raise pre-
sumption that their testimony would be ad-
verse.

Appeal from the District Court of the
United States for the Southern Division of
the Northern District of California; Frank
H. Kerrigan, Judge.

Suit by the Redwood Steamship Compa-
ny, owner of the steam schooner Katherine,
against the United States Shipping Board
Emergency Fleet Corporation and the United
States. Decree for respondents, and libelant
appeals. Affirmed.

William Denman and William B. Acton,
both of San Francisco, Cal., for appellant.

Geo. J. Hatfield, U. S. Atty., and Esther
B. Phillips, Asst. U. S. Atty., both of San
Francisco, Cal., for appellees.

Before GILBERT, RUDKIN, and DIE-
TRICH, Circuit Judges.

RUDKIN, Circuit Judge. On the morn-
ing of May 3, 1924, the steamship President
Lincoln came into collision with the steam
schooner Katherine on the waters of San
Francisco Bay, causing injury to the latter.
The present libel was filed in the court below
to recover damages for the injury thus sus-
tained, and, from a decree of dismissal, the
present appeal is prosecuted.
[1] Shortly before the collision, the Lincoln
left quarantine near Alcatraz Island, and was
proceeding around the docks and piers to her
berth at pier 44. At the same time the Kath-
erine was proceeding from the Alameda side
of the bay to pier 17 on the opposite shore.
The vessels sighted each other as the Kather-
ine rounded Goat Island. They were then ap-

*Rehearing denied May 9, 1927.

proximately one half mile apart according to
the testimony of the two masters, and the cus-
tomary passing signals were exchanged.
When sighted, the Katherine had the Lincoln
on her own starboard side, and under the in-
land rules·it was her duty to keep out of the
way of the Lincoln and to slacken speed, or
stop, or reverse if need be. On the other
hand, it was the duty of the Lincoln to keep
her course and speed. The officers of the Lin-
coln testified that she did maintain her course
and speed; that the Katherine likewise main-
tained her course and speed until she crossed
the bow of the Lincoln, when the·vessels were
about 300 feet apart; that the Katherine then
turned abruptly to starboard; that danger
signals were given; and that the Lincoln
struck the Katherine a glancing blow about
18 feet forward of the stern on the port side.
The officers of the Katherine, on the other
hand, testified that immediately upon the giv-
ing of the passing signals the Katherine port-
ed her helm and continued so to do until the
time of the collision, and that the Lincoln
turned her course to port, striking the Kath-
erine before she had time to get out of the
way

The court below found the facts substan-
tially as testified to by the witnesses for the
appellees. ·It found that the Lincoln main-
tained her course; that her change of speed,
if any, in no wise contributed to the accident;
that the Katherine maintained her course and
speed after the passing signals were given un-
til she had crossed the bow of the Lincoln;
that she could have·crossed in safety had she
continued on that course, but that she turned
abruptly to starboard when the danger sig-
nals were given and was struck by the Lincoln
as already stated.

These findings in the main are amply sup-
ported.by the testimony. Counsel for the ap-
pellant contends, however, that certain facts
and circumstances in the case demonstrate
that the witnesses for the appellees were ei-
ther mistaken or testified falsely. In sup-
port of their contention that the Lincoln was
constantly increasing her speed up to the time
of the collision, it is claimed that her full
speed was 18 knots per hour, that the second
turbine was cut in 8 or 9 minutes before the
collision, and that this would necessarily in-
crease her speed and would continue so to do
until the maximum speed of 18 knots per
hour was reached. But the master of the Lin-
coln testified that full speed ahead in port did
not mean 18 knots per hour, or anything like
that rate of speed. What rate of speed it did
indicate he did not state, nor was he asked to
explain. All of the officers of the Lincoln

agreed that there was no material change of speed prior to the collision, and there was no substantial testimony to the contrary on the part of the appellant, aside from testimony tending to show that the Lincoln appeared to be coming pretty fast prior to the collision. Furthermore, when the vessels were first sighted at a distance of about one-half mile apart, they were approaching each other almost head on; the master of the Katherine placing the position of the Lincoln at about a point off his starboard bow, the master of the Lincoln placing the position of the Katherine at about two or three points off his port bow. The speed of the Lincoln was about 9 or 10 knots per hour, and the speed of the Katherine about 6 knots per hour, so that the combined speed of the two vessels would cover the distance between them in about two minutes. It seems apparent, therefore, that the speed of the Lincoln increased little if any in that brief period, and we agree with the court below that her change of speed in no wise contributed to the collision.

Again, it is contended that, notwithstanding the testimony to the contrary, the Lincoln changed her course immediately prior to the collision, and that this change is demonstrated by the gyroscope record. An expert witness for the appellant testified that the change of course to port, as indicated by this record, occurred shortly before the collision, while a like witness for the appellees testified that the change took place after the collision, when the Lincoln changed her course to stand by the Katherine. The time indicated by the gyroscope record was some minutes slower than the time indicated by the ship's clock, and for this reason, among others, the witnesses were not agreed as to the course of the Lincoln at the time of the collision as indicated by the chart. As already stated, one witness was of opinion that the change of course preceded the collision, while the other was of opinion that the change followed the collision. It seems to us that the latter view is the more reasonable and better harmonizes with the other testimony in the case, especially in view of the fact that no reason has been assigned for any such change.

Again, it is contended that there were erasures and defects in some of the ship's logs, and that witnesses were not called to explain these changes and defects. In answer to this contention we deem it sufficient to say that no such claim was advanced in the court below, and it is now too late to raise these questions after all opportunity for explanation' has passed. Realizing this, perhaps, counsel for the appellant suggested on the argument that the appellees might have applied to this court for leave to take further testimony after the charges were made in their brief, but the appellees were under no obligation to make the application, and there is little likelihood that it would have been granted, if made.

[2] It is likewise contended that the appellees failed to produce as witnesses the helmsman and the engineers, and that such failure on their part gives rise to a strong presumption that the testimony would be unfavorable to them if produced. But the collision occurred in the open bay, in broad daylight; the appellant called as witnesses five or six officers and others who were in a position to observe the movements of the two vessels at and prior to the collision, and we doubt very much whether the court would be at all aided if the record had been incumbered with the testimony of the entire crew and all the passengers.

Another contention is that the claim of the appellees that the Katherine made a 90 degree turn within the brief period elapsing between the giving of the danger signals and the collision is absurd. There would seem to be merit in this contention unless the witnesses were mistaken in their estimates as to courses, time, or distance. But the contention of the appellant that the Katherine turned to starboard upon the giving of the passing signals and continued so to do, until the collision occurred is equally untenable. As already stated, the Katherine was headed almost directly for the Lincoln and the Lincoln was headed almost directly for the Katherine when the vessels sighted each other, and, if the Katherine immediately turned to starboard and continued so to do, there would have been no collision. And, while it does not seem probable or even possible that the Katherine could cross the bow of the Lincoln on the course indicated by some of the witnesses and then turn so abruptly as to receive the blow on the opposite side, yet it seems equally clear that the Katherine did not change her course when the passing signals were exchanged, as claimed. The collision took place at a point opposite pier 17, which was the destination of the Katherine. The distance off shore or from the pier to the place of collision was estimated by all the witnesses save one at from little more than a ship's length to 1,000 or 1,200 feet. This would seem to indicate that the Lincoln was little, if any, off her course, considering her size and destination, and it would likewise seem to indicate quite clearly that the Katherine continued on her course toward the pier after the passing signals were given, and that she did not yield the right of way by im-

mediately turning to starboard as claimed, and as was her duty to do.

Other contentions are made in the briefs, but they call for no comment. The only question in the case was a question of fact; the court below found adversely to the appellant, and we see no sufficient reason for disturbing the finding thus made.

The decree is affirmed.