HOLCOMBE v. FERLITA et al.

THE DOROMAR.

No. 12627.

United States Court of Appeals
Fifth Circuit.

April 25, 1950.

264

A. Lee Bradford, Miami, Fla., for appellant.

Douglas D. Batchelor, Miami, Fla., Henry N. Longley, New York City, Ezra G. Benedict Fox, New York City, for appellees.

Before HUTCHESON, Chief Judge, and WALLER and RUSSELL, Circuit Judges.

RUSSELL, Circuit Judge.

The Motor vessel "Doromar," transporting a cargo of bananas from Cuba to Miami, Florida under charter party[1] as a pri-

vate carrier, while attempting to cross the Bahama Banks, went aground on Guinchos Cay at 1:10 o'clock the morning of August 14, 1947. A portion of the cargo was jettisoned in an attempt to refloat the vessel, and the remainder of the bananas spoiled. The shipper-charterer libelled the Doromar for the resulting damages, basing liability upon the allegations that the Doromar was "improperly equipped, manned and outfitted and her engines and compass were in an unseaworthy condition." The answer specifically denied these allegations.

The cause was referred to a Commissioner, who heard evidence, made findings of fact and conclusions of law, and recommended the entry of a decree for the amount of damage claimed, less $800, the balance due by shipper on the charter hire. The District Judge overruled the respondent's exceptions and, adopting the Commissioner's report, decreed that libellants recover. Appellant here insists that the Court should have sustained the exceptions and entered a decree for the respondent.

There is no substantial conflict in the testimony, but from it the parties urge contrary conclusions. The shipper offered proof of receipt in good order, nondelivery, and damages and rested. The Doromar introduced testimony showing that six weeks before the vessel left Miami for Cayo Mambi, Tanamo Bay, Cuba, to take on the shipment of bananas in accordance with the terms of the charter, its engines had been replaced and the vessel overhauled. A "shakedown" run showed the engines and the vessel to be in good condition. At this time the compass of the Doromar was "spotchecked" by a Marine Captain by lining the vessel with known direction markers. The compass properly checked on two headings. The compass had been checked by an expert on May 10, 1946 and showed deviations within the normal of the average compass. These were stated upon the compass card of the Doromar. In this connec-

1. "The said vessel shall be tight, staunch, strong and in every way firm for such a voyage and to carry the cargo of the Charterer."

"The Acts of God, restraint of princes and rulers and the countries' enemies, fire, rivers, and navigations of what nature and kind soever during said voyage, riots, strikes, floods, fire or any extraordinary occurrences beyond the control of either, always excepted."

tion, a compass expert, called as a witness by the shipper, was unwilling to state whether the replacement of the engines would affect the accuracy of the compass and "the only way to tell would be to check it. There is no set rule." The only "way to be sure" would be to check it and adjust the compass to eight headings as had been done by him on May 10, 1946. The Captain of the Doromar had come well recommended and was competent, and the vessel was fully manned with a competent crew. While en route to Cayo Mambi its port engine became disabled. Thereupon the agent of the charterer was notified. Upon arrival of the vessel at Cayo Mambi the cargo of bananas had already been cut and were on the wharf ready for shipment. No other vessel was available and the master assured the shipper that the return voyage could be made by one motor. Under these circumstances the shipper directed the cargo loaded. After leaving port the starboard engine went out. A tow was obtained and the vessel proceeded, and the engine was repaired while in tow.

The master was dead at the time of the hearing, and subsequent events, material here, are predicated upon the log entries. From these it is shown that at 7:47 p. m., August 13, 1948, in the vicinity of Cay Lobos light, the Doromar cleared the towing vessel and was full away for Miami. From the log entries, interpreted by those familiar with such matters, it is possible to compute its approximate course and distance from the light at that time, and again at 10:00 o'clock when the light was dipping on the horizon. The vessel was following a course of 308 degrees with one degree error allowed. This course continued until the time of the stranding some five hours later. The log showed no allowance for either moderate or fresh easterly winds, except one point at 12:00 o'clock, and no allowance for the known deviations of the compass, though entry of a one degree deviation, normal for that vicinity, was made, and no allowance for the current. The normal course from the vicinity of Cay Lobos light across the Bahama Banks to Miami is 308 North by Northwest, the charted course, but allowance must be made for the wind and current conditions. As stated by one witness, the normal course is "always from the northwest about 309 to 315 varying for weather conditions," and this would take the vessel anywhere from four to six miles from Guinchos Cay "dependent upon the weather." There is no light on Guinchos Cay and it is not visible at night. A master mariner testifying as an expert from the log entries, thought it evident that proper allowances had not been made, and there was testimony, based upon the approximate location of the point of change of course near Cay Lobos, with due consideration given the compass deviations and the wind force that the indicated compass course of 308 should have carried the vessel 4.7 miles north of Guinchos Cay. However, this did not take into consideration the effect of the current, which if going out, dependent upon its strength, would take it off course from one-half knot to better than a knot an hour. The mate who had taken over the wheel from the master about forty-five minutes before the stranding testified he had been instructed to run a course of 308 and was so steering the vessel. He was not specific as to how long the current had been running out, but stated that immediately prior to and after the stranding there was a very strong tide going out. In his opinion the tide caused the grounding.

The findings of fact by the Commissioner which are now material are set forth below.[2]

2. "The engineer was drunk when the vessel departed from Cayo Mambi and this may have accounted for the second engine going out of commission on the afternoon of the 11th but the delay which resulted from this second engine going out of commission was not serious enough to account for the damage which the cargo suffered.

"In approaching Guinchos Cay the log indicates that the captain (who was dead at the time of taking testimony in this cause) was following the correct course; that he had made allowances of one degree east for variation but that he had not made allowances for compass deviation of three degrees west; that an easterly wind was blowing and

The Commissioner after stating the high degree of diligence required of the Doromar, and that the burden was upon it to disclose the cause of loss, and referring to the presumption raised by proof of delivery to the carrier in good order and proof of nondelivery in like condition, concluded that since the evidence did not support a finding that the stranding resulted from an error of navigation, there was a presumption it was caused either as a result of the compass being out of order, or as the result of negligence in the management of the vessel. He determined that the Doromar had not overcome that presumption and was therefore liable for the loss. Since we view the question of nonliability of the Doromar to be clearly established by the facts, (which we adjudge contrary to the findings made below), we do not discuss the correctness of the legal conclusions adopted by the Court, except to say that silence must not be construed as giving consent.

 We discover no basis in the evidence to support a finding that the Doromar was not seaworthy because the compass was defective, or that the vessel was improperly equipped or manned. Other than the fact the Doromar ran aground, there is no basis for finding the compass defective. The evidence is undisputed that the master was a qualified mariner, who "came well recommended," and likewise that the vessel was manned by a competent crew. It is true

that the Commissioner found that the engineer was drunk when the vessel left Cuba. He found that this had nothing to do with the grounding. Neither can we find that this condition of the engineer contributed to the grounding. We think it clear from the evidence that the stranding resulted from an error of navigation. Since the normal accuracy of the compass is established, the testimony; that the course followed was the usual one, but that the log shows that no allowance was made for deviation in the compass, for the wind, or for the current; and the extent to which the current would carry the Doromar off the compass course, clearly establishes that the grounding was caused by the failure to evaluate and apply these elements, and was therefore the result of an error in navigation. Liability for loss from this cause was excepted by the terms of the charter. The finding of the Commissioner to the contrary, adopted by the Court, is therefore clearly erroneous.

The Court erred in adopting the Commissioner's recommendations and in decreeing recovery in favor of the shipper. The exceptions of the Doromar to the Commissioner's report should have been sustained and judgment entered in favor of the vessel for the $800 balance of charter hire.

The cause is remanded, with directions to enter judgment in accordance with this opinion.

Judgment reversed.

that the tide was running out (west). The effect of the failure to allow for the compass deviation, tide and wind would be to carry the vessel to the left towards Guinchos Cay. However, even after making due allowances for these factors the vessel still should have cleared Guinchos Cay by more than four miles. So it does not appear that the vessel went aground on Guinchos Cay as a result of the failure to make allowances for these factors.

"The compass was carefully checked by an expert on May 10, 1946 and found to be in good order. It was checked

again by Captain Byrd on a trial run in the Miami harbor immediately before departure on this voyage after extensive repairs and overhauling of the engines. There is no evidence that it was not in good order when the vessel went aground.

"The damage to the cargo resulted from the vessel being grounded on Guinchos Cay and from the delay in arrival at Miami occasioned thereby.

"The evidence does not support a finding that the vessel went aground as the result of errors in navigation or that it went aground as the result of one engine being out of order."