**IONION STEAMSHIP COMPANY OF ATHENS**

v.

**UNITED DISTILLERS OF AMER-ICA, Inc.**

No. 15811.

United States Court of Appeals
Fifth Circuit.

July 20, 1956.

Leon Sarpy, Chaffe, McCall, Phillips, Burke & Hopkins, Leon Sarpy and Donald A. Lindquist, New Orleans, La., for Ionion S. S. Co., appellant.

Francis Emmett, Brunswich G. Deutsch, Deutsch, Kerrigan & Stiles, New Orleans, La., for appellee, Eberhard P. Deutsch, René H. Himel, Jr., New Orleans, La., of counsel.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The District Court, on the cargo owner's libel for damage, held that the strandings of The Ionian Pioneer as she left San Pedro de Macoris, the second of two loading ports under a molasses voyage charter, and again while leaving Nuevitas, Cuba, a claimed port of refuge, were caused by the owner's failure to make the vessel seaworthy. With this fell the shipowner's cross libel for General Average contributions. Defending against these acknowledged strandings, the shipowner claimed that, at least at San Pedro, it was a navigational error excused under the charter party, was not caused by unseaworthiness, and if there was unseaworthiness, there was no showing that it was from the owner's failure to exercise due diligence.

Coming here after a full trial with seventeen witnesses, nine of whom appeared in Court, detailed findings of fact and a separate, able opinion fully expounding the whole case, United Distillers of America v. The T/S Ionian Pioneer, D.C., 130 F.Supp. 647, 1955 A.M.C. 1338, the shipowner's burden on this appeal is the substantial one of convincing us that these findings of fact and fact inferences are clearly erroneous. C. J. Dick Towing Company v. The Leo, 5 Cir., 202 F.2d 850, 1953 A.M.C. 498; Mississippi Valley Barge Line Company v. Indian Towing Company, 5 Cir., 232 F.2d 750, 1956 A.M.C. 757; Societa Anonima Navigazione Alta Italia v. Oil Transport Company (The Mongioia), 5 Cir., 232 F.2d 422; Shockley v. United States, 5 Cir., 224 F.2d 557, 1955 A.M.C. 1731.

This is especially so because, essentially, the controversy is the simple factual one: did Ionian Pioneer go aground because of her unseaworthy steering apparatus? Or did she strand because of navigational errors in departing at night, without setting compass course, without a tug, and mistaken wheel orders or their faulty execution by the helmsman? The

heart of this question was the physical maneuvering of the vessel. What did she do? What made her do it? The Master and Pilot would normally be the articulate source for this knowledge. In the quest for truth the Judge, with the opportunity of seeing and hearing him testify in Court, categorically discredited the Master in his explanation. To discredit, to disbelieve, so important a witness upon such a crucial matter quite properly permeated the entire decision. For us to set aside the Trial Judge's conclusion on this would inevitably put us in the middle of retrying the whole case. Bisso v. Waterways Transportation Co., 5 Cir., 235 F.2d 741.

■■ The libelant has never shirked its burden, Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89, 1941 A.M.C. 1697, of affirmatively establishing a case under the contract of private carriage which warranted, at least, due diligence to make the vessel seaworthy,[1] and by reflex, from this and the catch-all exculpatory clause [2] so tenderly embraced by shipowner, imposed liability where the stated exception was not made out. The Zesta, 5 Cir., 212 F.2d 137, 1954 A.M.C. 899; The Framlington Court, 5 Cir., 69 F.2d 300, 1934 A.M.C. 272. It reasoned correctly that if the strandings were caused by unseaworthiness due to lack of due diligence, then it was not an excepted "loss or damage arising or resulting from" [1] navigational error, [2] stranding or [4] latent defect, [6] any other cause without actual fault or privity, The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546; and certainly not if these were merely concurring causes. Compania de Navigacion La Flecha v. Brauer, 168 U.S. 104, 118, 18 S.Ct. 12, 42 L.Ed. 398; The Olga S., 5 Cir., 25 F.2d 229, 1928 A.M.C. 831.

■ In this task, while ultimate risk of non-persuasion may have been on the cargo, it had the usual advantages of a bailor putting on the carrier, as the person having the means of knowledge, the obligation of coming forward with some explanation, Commercial Molasses Corp. v. New York Tank Barge Corp., supra; The Northern Belle, 9 Wall 526, 76 U.S. 526, 19 L.Ed. 746, 748; Southern Ry. Co. v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836, and a presumption of unseaworthiness existing at the beginning of the voyage, where machinery, gear, or appliances fail shortly after the beginning of the voyage without accident, stress of weather, or the like, furnishing an adequate explanation as a likely cause. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65; The Olancho,

---

1. The charter provided: "1. The vessel, classed as aforesaid and to be so maintained during the currency of this Charter, shall, * * *, proceed * * * to [loading ports], and being tight, staunch and strong, * * * and being in *every respect fit* for the voyage, so far as the foregoing conditions can be attained by the *exercise of due diligence*, perils of the sea and any other *cause* of whatsoever kind *beyond* the Owner's *control* excepted, shall load * * *" [Italics supplied.]

2. Clause 18 (for convenient reference numbers in [ ] are added):
   "The vessel, her Master and owner shall not unless otherwise in this charter expressly provided, be responsible for any loss or damage arising or resulting from:
   "[1] any act of neglect on the part of the *master, pilots,* or other servants of the owner in the *navigation* or management of the vessel;

"[2] collision, *stranding* or peril, danger or accident of the seas, or other navigable waters;
   "[3] any act or omission of the charterer or owner, shipper or consignee of the cargo, their agents or representatives;
   "[4] breakage of shafts, or any *latent* defects in hull, equipment or machinery;
   "[5] *unseaworthiness of the vessel unless caused by want of due diligence on the part of the owner* to make the vessel seaworthy, or to have her properly manned, equipped and supplied;
   "[6] or from any other cause of whatsoever kind arising *without the actual fault or privity of the owner*," (Italics supplied.)
   Cf. The Monarch of Nassau, 5 Cir., 155 F.2d 48, 1946 A.M.C. 853; The Doromar, 5 Cir., 181 F.2d 263, 1950 A.M.C. 761, recognizing the validity of such clauses.

D.C.S.D.N.Y., 115 F.Supp. 107, 1953 A. M.C. 1040; The Agwimoon, D.C.Md., 24 F.2d 864, 1928 A.M.C. 645, affirmed 4 Cir., Atlantic Gulf & West Indies Steamship Lines v. Interocean Oil Company, 31 F.2d 1006, 1929 A.M.C. 570.

■ But these technical advantages were scarcely necessary for unseaworthiness was abundantly proved. So much so that, taking as the Golden Text, the shipowner's expert's kindly estimate that Ionian Pioneer "was coming to the twilight of her life" and his scriptural exposition that the vessel was, " * * * not as good as I would like her to be * * *. We have arrived at a condition in a ship where she is old and becoming wasted and defects are appearing, but it is possible to squeeze, and the word 'squeeze' is almost right, to squeeze another few months out of" her, the District Judge nearly exhausted the storehouse of descriptives: "The Ionian Pioneer was a 35-year old steel tank ship. She was owned by Greeks, flew the Panamanian flag, and was manned by the flotsam of many countries. She was rusty, she was leaky, she was hogged. More importantly, and most unfortunately, she had an unpredictable penchant for sheering to port at the most inopportune moments. On two such sheers, she went aground and libellant here has sued for the value of the cargo lost by jettison as a result of these strandings. A short time after the incidents in suit, the vessel lost its classification and was considerately consigned to scrap."

The voyage had scarcely been undertaken until flagrant unseaworthiness revealed itself. Arriving at La Romana, Dominican Republic, the first loading port, September 26, over 200 tons of sea water leaked through badly wasted shell plating in way of her engine room spaces to cover the tank tops. Worse, once aboard, nothing could be done with the sea water for her ballast pumps, in deteriorated condition, broke down. This sea water, as unwelcome cargo, stayed with the vessel as she departed September 27 for San Pedro, D. R., to complete loading, and was still aboard at the time of the stranding September 28. The continued presence then of this sea water markedly affected the salvage maneuvers and if causal relationship must be pinpointed, this alone is adequate basis for it.

Entering San Pedro Harbor September 27, the vessel, taking the first of at least seven sudden sheers to port, got out of control and out of the channel. In the local Pilot's judgment it was because "she did not answer the helm properly." At San Pedro she completed the loading of the last fourth of her cargo. So much so, indeed, that with her permanent hog of nine inches, she was overloaded two feet six inches below the applicable summer limit of her Plimsoll marks under the International Load Line Convention 1930, 47 Stat. 2228, e. g., 46 U.S.C.A. § 85 et seq. Of course the shipper could have shut off the supply from shoretanks but the Master [3] recognized that this was his, not the charterer's, cf. Oxford Paper Co. v. The Nidarholm, 282 U.S. 681, 51 S. Ct. 266, 75 L.Ed. 614, 1931 A.M.C. 522, responsibility. This palpable unseaworthiness, Corsar v. J. D. Spreckels & Bros. Co., 9 Cir., 141 F. 260; The Benjamin Noble, 6 Cir., 244 F. 95, affirmed 249 U.S. 334, 39 S.Ct. 292, 63 L.Ed. 631; Knauth, Ocean Bills of Lading, 4th Ed. at pp. 191, 192, not only existed with full knowledge of the owner's responsible servants, it was *created* by them and affected the entire venture since all cargo (La Romana and San Pedro), loaded in the same tanks, was imperceptibly mixed.

So, in the evening darkness of September 28, hogged, leaking and overloaded, Ionian Pioneer commenced her charter party voyage to New Orleans from the last of the two optional loading ports.

---

**3.** "Q. Shore people had nothing to do with the loading of the vessel? A. Nothing.

* * * * *

"Q. And if the vessel was overloaded and proceeded to sea, that would be your responsibility? A. If I overloaded the vessel?

"Q. —Yes? A. —Yes, sir."

Proof of general unconcern and the vessel owner's participation in it, is the fact that the vessel, despite the Master's radio request, and owner's refusal because of exorbitant cost, to purchase locally 50 tons of fuel oil to afford adequate margin of safety, was leaving with known insufficient bunkers aboard, The Willdomino v. Citro Chemical Co., 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491, 1927 A.M.C. 129; The Malcolm Baxter, 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901, 1928 A.M.C. 960, under the owner's express orders as a remote "Master" to "proceed New Orleans reduced speed."

A small tug alongside was used in assisting the vessel around the one bend in the channel at the juncture of the turning basin and the dredged channel. The vessel straightened up, and the tug cast off. The night was clear with little or no wind and no tide, and the lighthouses on Pescadero Point and South Point were lighted brightly. The channel buoy lights were burning as the pilot launch preceded the vessel to light the channel and sea buoys. The entrance to sea was straightaway. The vessel proceeded down the center of the channel at half speed until she was about midway between the breakwater and Buoy No. 2 when the Master reduced speed to dead slow ahead to give the pilot launch time to light the sea buoy.

The Pilot, on the starboard wing of the bridge, seeing that the buoy was lighted, returned to the wheelhouse and saw that the vessel had sheered to port. In a moment she stranded on the north side of the shoal off Pescadero Point. The Pilot was emphatic that the vessel sheered and stranded because she was not steering properly—a conclusion [4] affirmed by the District Judge while characterizing the Master's charge of pilot error: "the Master's testimony is incredible."

The Ionian Pioneer fetched up at the bow but forward of her tanks. Her stern was in 38 feet of water so no water damage was, or could have been, done to her steering machinery by the stranding or salvage operations. Because of her overloaded condition and the 200 tons of water under her engine room, it was impossible to transfer sufficient cargo from Numbers 1 and 2 tanks to the empty aftermost tank without submerging her stern, so the Master jettisoned the remainder of the cargo, approximately 990 tons, from these forward tanks. This jettison is therefore traceable to the unseaworthiness of a leaky vessel, to a faulty steering apparatus, or both.

She refloated 6:30 a. m. September 29, returned to the dock at San Pedro, and after a survey which did not include examination of her steering machinery, she again departed. The Pilot reported the "same sluggishness to respond to the helm as when [he] brought her in" but with "some difficulty" he managed to maintain control. Bunker, water and cargo tanks had been contaminated by sea water entering through the vessel's plating opened up during the strand or from engine vibrations while attempting to free herself. On departing it was known that the initial supply of bunkers, now further reduced because of extensive contamination by sea water, would be inadequate to make New Orleans. But instead of assuming the power (and responsibility), United Geophysical Co. v. Vela, 5 Cir., 231 F.2d 816, 1956 A.M.C. 745, giv-

---

4. In this battle of credibility the Judge also had before him the Pilot's brief *ex parte* statement made September 29 which the vessel thinks exonerates her altogether: "On leaving my position at the bridge to go to the starboard side to verify if the boat had already reached the Bell Beacon, on returning again to my position, the helmsman, let the ship drop toward larboard [port], falling on the sandbank where it was stranded." The statement does not pretend to fix the cause of the helmsman letting the ship drop to port. That physical result could take place from the helmsman's error or steering gear failure, or both. So far as helmsman action, he alone would know, and the owner's failure to produce this key navigational witness was a proper factor for consideration and criticism by the Court. Cf. Redwood S.S. Co. v. United States Shipping Board Emergency Fleet Corporation, 9 Cir., 18 F.2d 382, 1927 A.M.C. 756.

en to his command by procuring additional bunkers locally, the Master set sail for *New Orleans* in his damaged vessel confident in the expectation, soon made good, that owners or operating agents from a "bridge" in Lower Manhattan would supply him with instructions. Soon forthcoming, the Master, pursuant to subsequent radioed instructions from the owners, deviated to Nuevitas, Cuba. Entering Nuevitas Harbor October 4, the Pilot had great difficulty in steering the vessel. Warned by the quartermaster that "the machinery on the wheel [doesn't] work well," the Pilot, a completely disinterested witness, testified that "it was almost impossible to keep her on a steady course" and characterized Ionian Pioneer as " * * * the worst ship that I ever had."

Proceeding from Nuevitas on October 5, after bunkering, The Ionian Pioneer again sheered to port, failed to answer her helm despite favorable weather and tidal conditions, and stranded a second time. She came free on the flood tide, but after continuing down the channel, she sheered to port again and headed for shore. To avoid a third stranding, the Pilot had to drop an anchor. Not too surprisingly, he described the steering apparatus as defective. The vessel finally cleared the harbor and made for New Orleans.

But her sheering days were not yet over. Despite a very slight current, the Mississippi River Pilot could not turn her into South Pass without use of an anchor. And, while in the Pass, she sheered violently to port on two occasions, barely escaping collision with other vessels, the first so close that the other vessel had to nose into the bank and drop an anchor. In the second, The Ionian Pioneer failed to answer her rudder and to avoid collision had to drop an anchor. The River Pilot declined to proceed further until this condition was corrected. The chief engineer then made temporary repairs by purging the telemotor lines of air. At New Orleans repairs were made to cure defects which experts concluded must have existed over a con-

siderable period of time. She then proceeded to Mobile for extensive stranding repairs, where the steering engine was presumably tested and found in good order. But leaving shipyard at Mobile, her previous steering difficulties recurred. The vessel returned immediately to shipyard where her telemotor was opened up completely for the first time since January 1950, and substantial defects discovered and corrected in both the telemotor system and the steering engine.

This brings us back to San Pedro, for the specific fact issue was: why did Ionian Pioneer strand? This was a question about a physical event in no way affected by prior knowledge, duty to anticipate, or the like. It is not often that to throw light on a controverted physical phenomenon, a history so fruitful would be available. With no real suggestion that the initial stranding at San Pedro or the second one at Nuevitas would account for continued, recurring, erratic steering, these events within two weeks' time gave ample basis for the Court's conclusion. A "penchant for sheering to port" was a colorful, but charitable, and accurate estimate. This was, of course, a finding both of unseaworthiness and the efficient cause of the damage.

■ Was the unseaworthiness caused by the owner's failure to exercise due diligence? On this the only serious concern is whether the shipowner ought to have known of these defects because, save for diligence in obtaining certificates of seaworthiness from Hellenic or Lloyds classification societies and which is certainly not the test, see Knauth, supra, page 187; The Abbazia, D.C.S.D. N.Y., 127 F. 495; Bank Line, Limited v. Porter (The Poleric), 4 Cir., 25 F.2d 843, 1928 A.M.C. 761 certiorari denied 278 U.S. 623, 49 S.Ct. 25, 73 L.Ed. 544; Sabine Towing Co., Inc., v. Brennan (The Edgar F. Coney), 5 Cir., 72 F.2d 490, 1934 A.M.C. 1122, 1129; and a few superficial repairs to parts of the steering apparatus, the last of which for the engine was July 12, 1951, and for the telemotor, January 31, 1950, the record is completely silent of any serious inspec-

tion and survey of the entire steering machinery before this charter party voyage began.

■ Abundant proof supplied the basis for the District Court's conclusion. There was, first, the erratic behavior of the steering engine over a period of at least two weeks' time from causes and defects of long standing. Existing as it did in such an advanced state, the Court could well infer that it had long existed and, existing, the owner in prudence should have known of it. Erie & St. Lawrence Corp. v. Barnes-Ames Co., D. C.W.D.N.Y., 52 F.2d 217, 1931 A.M.C. 1994. Where the standard of due diligence is applicable, it comprehends inspection and investigation, where prudent, to determine the existence of deficiencies before they become critical, and the failure to discover defects which examination would necessarily have disclosed is the very absence of due diligence. Artemis Maritimè Co. v. Southwestern Sugar & Molasses Co., 4 Cir., 189 F.2d 488, 1951 A.M.C. 1833; Huilever, S. A. Division Huileries Du Congo Belge v. The Otho, 2 Cir., 139 F.2d 748, 1944 A.M.C. 43; The Cornelia, D.C.S.D. N.Y., 15 F.2d 245, 1926 A.M.C. 1337. Moreover, the vessel had been through a hurricane on August 17, 1951, causing extensive damage and during which she had steering trouble with unusual knocking in her steering engine which continued down to arrival at San Pedro. Despite this, when hurricane damage repairs were made, no inspection of any kind was made of the steering apparatus.

■ Once it is determined that the shipowner ought to have known of these defects, it is plain that nothing was done about them. The failure on the part of any of the owner's servants, which includes the ship's Master, to take the prudent steps satisfying the non-delegable standard of due diligence is chargeable to it for, "a shipowner [does not exercise due diligence * * * by merely furnishing proper structure and equipment, for the diligence required is diligence to make the ship *in all respects* seaworthy; and that * * * means

due diligence on the part of all the owner's servants in the use of the equipment, before the commencement of the voyage and until it is actually commenced." International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 225, 21 S.Ct. 591, 593, 45 L.Ed. 830, 833. "In other words, the owners must show that those whom they employ to act actually used due diligence." The C. S. Holmes, D.C.N.D.Cal., 5 F.2d 358, 360, 1925 A.M.C. 729, 732, 733; The Maria, 4 Cir., 91 F.2d 819, 1937 A.M.C. 934; The Leerdam, 5 Cir., 17 F.2d 586, 1927 A.M.C. 509; California & Hawaiian Sugar Refining Corp. v. Rideout, 9 Cir., 53 F.2d 322, 1931 A.M.C. 1870.

■ The exercise of *due diligence* envisages some activity. This record is barren of *anything* which the owner or his servants did prior to the commencement of this voyage and each of its stages, Federal Forwarding Co. v. Lanasa (The Fort Gaines), 4 Cir., 32 F.2d 154, 155, 1929 A.M.C. 608; The Steel Navigator, 2 Cir., 23 F.2d 590, 1928 A.M.C. 388, The Glymont, 2 Cir., 66 F.2d 617, 1933 A.M.C. 1293, toward ascertaining or correcting defects whether of the steering gear, the leaking hull or her hogged condition. And to this may be added the deliberate overloading of the vessel which made her unseaworthy without a doubt. Actually, the acknowledged overloading defeats the argument labored so heavily by shipowner that it was the deep draft of the vessel on leaving San Pedro which made her sluggish and unmanageable.

And, since substantial further damage was done to the cargo remaining aboard the vessel when she stranded the second time at Nuevitas, that action of the vessel is inexcusable. Proceeding there, not from emergency arising at sea, cf. The Malcolm Baxter, supra, but from a known deficiency originating in an initial inadequate supply of bunkers and the later presumptuous interference with the essential command of the Master by preemptory order from shore based management, The Waalhaven, 2 Cir., 36 F.2d 706, 1930 A.M.C. 27, The Glymont, supra, the vessel is subjected to the consequenc-

es of an unwarranted deviation, see The Willdomino v. Citro Chemical Co., supra; The Pelotas, 5 Cir., 66 F.2d 75, 1933 A.M.C. 1188.

Finally, as to both cargo lost and damaged, the libelant adequately carried its burden of establishing that it was caused at least in *part* by conditions for which under the charter party, the vessel became liable. From that point the burden then fell upon the vessel to separate those portions of the damages attributable to an excepted cause, The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, 1934 A.M.C. 1573, and this she did not do.

Affirmed.