794 F.2d 1552
 1987 A.M.C. 291
 FIREMAN'S FUND INSURANCE COMPANIES, a corporation,
Intercontinental Metals Corporation and Berg Steel
Pipe Corporation, Plaintiffs-Appellants,
v.
M/V VIGNES, her boilers, furnishings, tackle, etc., in rem;
A/S KRISTIAN JEBSEN REDERI, her owners, and Cardinal Steel
Corporation, now known as Cardinal Shipping Corporation, in
personam, Defendants-Appellees.
 No. 85-3602.
 United States Court of Appeals,
Eleventh Circuit.
 July 30, 1986.
 
 George D. Gabel, Jr., Mitchel E. Woodlief, Jacksonville, Fla., for plaintiffs-appellants.
 Brendan P. O'Sullivan, Tampa, Fla., for Rederi.
 Stephen A. Hould, Jacksonville, Fla., for Cardinal Shipping Corp.
 Appeal from the United States District Court for the Northern District of Florida.
 Before HILL, Circuit Judge, HENDERSON* and BROWN**, Senior Circuit Judges.
 JOHN R. BROWN, Senior Circuit Judge:
 
 
 1
 In this appeal, we must determine whether the District Court erred in holding that the shipowner (Kristian Jebsen Rederi) and the charterer (Cardinal Shipping Corporation) of the M/V VIGNES exercised due diligence to make the VIGNES seaworthy. The District Court ruled that the seawater-damage to the VIGNES' cargo resulted from perils of the sea and latent defects not discoverable by the exercise of due diligence. After careful examination of the record in this case, we conclude that the District Court did not err and we therefore affirm its judgment.
 
 The Ship, Elongated, Sets Sail
 
 2
 M/V VIGNES is a three-hold, steel hulled cargo vessel built in 1979. Her owner is defendant-appellee A/S Kristian Jebsen Rederi (Kristian).[1] In late 1980, VIGNES underwent modifications in the shipyard at Bremerhaven, Germany. The vessel was lengthened by approximately 15 meters, requiring work to be performed on the ship's hatchcovers and hatch coamings. Upon completion of the modifications, VIGNES was surveyed by Det Norske Veritas, a recognized international classification society. All the hatchcovers and hatch coamings were tested with streams of water fired from high pressure hoses and were found to be completely watertight.
 
 
 3
 After leaving the shipyard, VIGNES made two short voyages before setting sail on the voyage which led to this lawsuit. During these two voyages there were no leaks in the hatchcovers, but a leak was detected in a pipe in the No. 1 cargo hold. VIGNES was returned to the shipyard to effect the necessary repairs. Following the repairs, the hatchcovers were washed down to test for leaks, but no leakage was revealed. VIGNES then set sail for Oxelosund, Sweden to load the cargo of steel plates involved in this suit.
 
 
 4
 Defendant Cardinal Steel Corporation (Cardinal) chartered VIGNES for the purpose of transporting about 5,350 tons of steel plate from Oxelosund to Panama City, Florida, the location of the plant of Berg Steel Pipe Corporation (Berg), the purchaser of the steel plate. Berg purchased the steel from Swedish Steel, the Oxelosund-based manufacturer, by placing an order with its purchasing agent, Intercontinental Metals Corporation (Intercontinental). Intercontinental was insured by Fireman's Fund Insurance Companies (Fireman's Fund) under an all-risk policy.
 
 
 5
 Before the steel plates were loaded aboard VIGNES, they had been stored outside at Oxelosund for between 1 and 89 days. The outside storage resulted in the formation of atmospheric rust on the plates, but this type of rust was insignificant in relation to the steel's intended use as fabricated large steel pipe.
 
 
 6
 VIGNES sailed from Oxelosund under the command of Captain Jan Drewes, an employee of Kristian, her owner. The hatchcovers were inspected prior to loading, and the hatchcovers' hydraulic sealing hooks were checked for tightness after VIGNES set sail. During the voyage, VIGNES encountered five days of heavy weather with winds up to force 10 on the Beaufort Scale and high seas of up to 25 feet breaking over the hatches. Seawater leaked into the No. 2 hold and had to be pumped out on two different occasions. It is undisputed that the seawater entered the hold through the hatchcovers.
 
 
 7
 Upon the arrival of VIGNES at Panama City, Florida, on February 19, 1981, 527 of the steel plates--about 25% of the shipment--were set aside as being suspected of seawater damage. Tests performed on those plates confirmed that the heavy rusting was caused by saltwater. Visual inspection of the holds revealed rust-colored splash marks on the sides of the holds where it appeared that water had dripped on the plates and splashed against the wall.
 
 
 8
 Berg rejected the 527 damaged plates, but used 78 of the damaged plates to meet a pressing order for pipe. Salvage bids were solicited for the remainder of the damaged plates, but Berg rejected the highest bid and purchased all the plates for the reduced price of $409,876.64.[2] Plaintiff Fireman's Fund, which insured Intercontinental (Berg's purchasing agent), paid Intercontinental $351,739.23, which constitutes the difference between the insured value (110% of the cargo's actual value) and the amount Berg paid for the damaged plates.[3] Fireman's Fund sought to recover from defendants the amount it paid under the insurance policy to Intercontinental. The District Court ruled in favor of the defendants and this appeal followed.
 
 Diligent Due Diligence
 
 9
 Under Sec. 1303(1)(a) of the Carriage of Goods by Sea Act (COGSA), the carrier[4] must exercise due diligence to make the ship seaworthy. 46 U.S.C. Sec. 1303(1)(a). As a reflex to this duty, Sec. 1304 provides that the carrier will not be liable for any damage resulting from unseaworthiness "unless caused by want of due diligence on the part of the carrier to make the ship seaworthy." 46 U.S.C. Sec. 1304(1). Section 1304 also provides that the carrier will not be responsible for damage resulting from "perils of the sea" or "latent defects not discoverable by due diligence." 46 U.S.C. Sec. 1304(2)(c), (p). The carrier has the burden of showing that any damage was brought about by one of the excepted causes listed in Sec. 1304. Campagnie De Navigation v. Mondial United Corp., 316 F.2d 163 (5th Cir.1963).
 
 
 10
 The District Court found that the carrier in this case exercised due diligence, and concluded that the damages resulted from perils of the sea and latent defects not discoverable by the exercise of due diligence. Questions of due diligence and proximate cause are fact questions, and the District Court's findings on these issues will not be overturned on review unless clearly erroneous. Marcona Corp. v. Oil Screw Shifty III, 615 F.2d 206, 208 (5th Cir.1980) (proximate cause); Socony Mobil Oil Co. v. Texas Coastal & International, Inc., 559 F.2d 1008, 1010 (5th Cir.1977) (due diligence); see also Hasbro Industries, Inc. v. M/S ST. CONSTANTINE, 705 F.2d 339, 341 (9th Cir.1983) ("due diligence is essentially a negligence concept and ... determinations of negligence in admiralty cases are findings of fact which will be given application unless clearly erroneous"), cert. denied, 464 U.S. 1013, 104 S.Ct. 537, 78 L.Ed.2d 717. Under the clearly erroneous standard, if the District Court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse even if we would have weighed the evidence differently and arrived at a contrary conclusion. See Anderson v. Bessemer City, 470 U.S. 564, ----, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. Appellants ("Cargo"),[5] however, maintain that the District Court's findings on due diligence and proximate causation were clearly erroneous.
 
 
 11
 First, Cargo argues that requesting a classification society to perform a test for watertightness is not enough to satisfy the carrier's duty to exercise due diligence.[6]
 
 
 12
 Cargo's argument rests primarily on the oft-quoted expression that seaworthiness--or due diligence to make a vessel seaworthy--cannot be proved simply by routine classification surveyor reports.[7] But that is not what occurred here. As pointed out earlier, the classification society's testing for watertightness was performed only a few weeks prior to the relevant voyage and involved testing under water pressures much greater than those encountered at sea. Thus, the classification society survey--though not conclusive standing alone--could be credited by the judge as very strong evidence of due diligence in this case. Moreover, the survey by the classification society was only one of a number of steps undertaken by the carrier to ensure seaworthiness. Before loading the steel plate at Oxelosund, VIGNES' cargo holds were washed down and inspected, and the bilge alarms were tested. After loading, the hatches were closed and secured with hydraulic hooks. After leaving Oxelosund, but before entering the Atlantic, the hatchcovers and hydraulic hooks were inspected once again. Finally, and very significantly, the VIGNES' hatches and hatchcovers had never been known to leak prior to the problems experienced on the subject voyage.[8] In light of all the preceding evidence, we conclude that the District Court was not clearly erroneous in finding that the carrier exercised due diligence to make the VIGNES seaworthy.[9]
 
 Knife-Edged Perils of the Sea
 
 13
 Cargo claims that the District Court was clearly erroneous in finding that the proximate cause of the damage was a combination of perils of the sea and latent defects not discoverable by the exercise of due diligence. Specifically, Cargo argues that the damage was caused by a patent defect discoverable by the exercise of due diligence--the use of hatchcovers without knife edges for extra compression.[10]
 
 
 14
 Contrary to the assertions of Cargo, there is testimony in the record--which the judge could credit--that there is no significant difference in the watertightness of hatchcovers with knife edges and those without. Moreover, the District Court never determined that the lack of knife edges was a "defect." Rather, the District Court merely stated that the lack of knife edges, if a defect at all, was not a "latent" defect. When read together with the Court's conclusion that the damage was caused by latent defects not discoverable by due diligence, it is readily apparent that the District Court did not attribute the cause of the damage to the lack of knife edges, whether "patent," "latent," "defective," or otherwise.[11] Therefore, we find no inconsistency in the District Court's findings which leads us to doubt its conclusions on due diligence and proximate cause.
 
 
 15
 In a nutshell, upon review of the entirety of the evidence, we hold that the District Court was not clearly erroneous in its findings on due diligence and causation.[12]
 
 
 16
 AFFIRMED.
 
 
 
 *
 See Rule 3(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 At this time it may be beneficial to list the cast of characters in this maritime drama
 Character Played by
 --------- ---------
Defendants-Appellees VIGSNES Herself
 Owner Kristian Jebsen Rederi
 (Kristian)
 Charterer Cardinal Steel Corporation
 (Cardinal)
Plaintiffs-Appellants Purchaser Berg Steel Pipe Corporation
 (Berg)
 Purchasing Intercontinental Metals Corp.
 Agent (Intercontinental)
 Purchaser's Fireman's Fund Insurance
 Insurer Co. (Fireman's Fund)
2
 Purchase Price Subject Matter
 -------------- -----------------------
 $ 65,969.49 78 plates already used
 343,907.16 449 remaining plates
 -------------- -----------------------
Total $409,876.64 527 plates
3
To illustrate:
 Actual sales value of the plates $692,377.16
 110% of value (the insured value) $761,165.16
 $761,615.16
 - 409,876.64 (amount Berg paid for the damaged plates)
 ------------
 $351,739.23 (amount of Berg's damages)
 
 
 [4]
 In this case both Kristian (the owner) and Cardinal (the charterer) are "carriers" for the purpose of the obligation to make VIGNES seaworthy. Kristian argues that the trial court found that it was not the carrier and that Kristian should therefore be dismissed from this appeal. Kristian's argument is a mischaracterization of the District Court's findings. The District Court found that Cardinal was a "carrier" for purposes of COGSA, a finding which Cardinal does not challenge on appeal. The District Court never intimated that Kristian was not a carrier or that Kristian was not required to exercise due diligence to make VIGNES seaworthy. Quite the contrary, the District Court ruled that the terms of the charter party expressly required the shipowner (Kristian) to exercise such due diligence. Thus, the District Court applied the COGSA due diligence provision to Kristian as well as Cardinal, as if both were COGSA "carriers." We continue to do so on appeal. Therefore, when we use the term "carrier" we are referring to both Cardinal and Kristian
 
 
 [5]
 All three appellants--Berg, International, and Fireman's Fund will henceforth be referred to collectively as "Cargo."
 
 
 [6]
 Due diligence "comprehends inspection and investigation, where prudent, to determine the existence of deficiencies before they become critical, and the failure to discover defects which examination would necessarily have disclosed is the very absence of due diligence." IONIAN PIONEER, 1956 A.M.C. 1750, 1758 (5th Cir.1956)
 Due diligence also connotes a certain amount of knowledge on the part of the carrier. Thus, it has been ruled:
 [T]he minimum knowledge that ought to be had by one without special training is (1) what would be apparent to most men of ordinary intelligence and experience who make use of their faculties; and, (2) what would be discovered by the kind of investigation that a man of reasonable prudence would make. In addition to these, a shipowner with special training ought to know (1) what would be apparent to most men with such special training; and (2) what would be discovered by the kind of investigation that they would make in the exercise of reasonable prudence. THE ESSO PROVIDENCE, 1953 A.M.C. 1317, 1326 (S.D.N.Y.1953).
 
 
 [7]
 See, e.g., IONIAN PIONEER, 1956 A.M.C. 1750 (5th Cir.1956); Artemis Maritime Co. v. Southwestern Sugar & Molasses Co., 1951 A.M.C. 1833 (4th Cir.1951)
 
 
 [8]
 Although Cargo argues that there was a leak in a cargo hold during the voyage immediately preceding the subject voyage, this argument again mischaracterizes the evidence. The leak discovered during the earlier voyage was a leak in a pipe inside the cargo hold. It was not seawater from outside the hold. The leak was promptly repaired and in no way cast doubt on the integrity of the hatchcovers
 
 
 [9]
 Although we approve the holding of the District Court that the carrier exercised due diligence on these facts, there is a possibility--always lurking in the appellate words of a writing judge--that more diligence will be required of the carrier in future voyages now that the VIGNES' possible susceptibility to leaking hatchcovers has come to light. This is more than a promise to keep our brothers and sisters free. It is a recognition that the law--landlubber or maritime--grows from each casualty and the law's response to it
 
 
 [10]
 As nearly as we can discern, this essentially restates Cargo's primary argument on appeal--that the carrier did not exercise due diligence. However, because the argument is couched in terms attacking the District Court's findings on causation, we undertake a separate discussion
 
 
 [11]
 Our conclusions are not diminished by the possibility that the District Court may have inadvertently slipped into confusion regarding the "latent defect" language when it assumed that the lack of knife edges was defective, recognized that the lack of knife edges was not latent, and concluded that this design was therefore not a "latent defect." It is the defectiveness which must be latent, not merely the design which leads to the defectiveness. In other words, the proper inquiry is not whether the lack of knife edges is latent but whether the defectiveness of the lack of knife edges is latent. Otherwise, the Sec. 1304(2)(p) exception for latent defects would be rendered meaningless as the design of a hatchcover, a cargo hold, etc. will never be latent. In other words, due diligence requires a carrier to reasonably inspect and discover visible defects rather than the hidden defectiveness, not discoverable upon reasonable inspection, of clearly visible design characteristics
 
 
 [12]
 Because of our conclusions, it is unnecessary to review the District Court's alternative finding that Cargo failed to establish damages