GOUNARES BROS. & CO., Inc., Appellant,

v.

UNITED STATES of America, Appellee.

No. 18719.

United States Court of Appeals Fifth Circuit.

June 21, 1961.

**80**

Vincent F. Kilborn, Willis C. Darby, Jr., Mobile, Ala., for appellant.

George F. Lynch, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., John B. Jones, Jr., Washington, D. C., Ralph Kennamer, U. S. Atty., Mobile, Ala., Louis F. Oberdorfer, Asst. Atty. Gen., A. F. Prescott, David O. Walter, Attorneys, Department of Justice, Washington, D. C., for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case presents primarily the question of the accrual of interest as a deduction to the payor corporation on an obligation owing to its controlling stockholder-officer-director. The Commissioner in a deficiency assessment treated the obligation as a debt for which interest would be .payable and deductible. But he concluded that it was accruable during each of the four years and not, as Taxpayer treated it, in the final (fourth) year in which it was paid. Accrual to the prior years had the ostensible and momentary effect of increasing expenses for each of these years, thereby increasing losses which normally would be carried forward to extinguish the deficiency in the year of payment. But this was forbidden in view of § 24(c) (1), 26 U.S.C.A. § 24(c) (1) (1939 Code), which requires that as between controlled taxpayers having different accounting methods, the interest accrued to the payer must be paid in cash (or constructively so) to the related payee within two and one-half months in order to be deductible. This was not done in the three prior years. The result is that while the corporation is accorded the right to treat the obligation as a debt giving rise to legitimate interest charges which were finally paid in cash (and thereby subject to income tax in the payee's hands), the corporation loses three-fourths of the deduction.

After payment and claim for refund, the Taxpayer sued to recover the deficiency. The District Court did not directly decide the question whether interest was to be accrued in each of the four years. Considering the manner in which the case was presented and tried, the Judge focused on two things. The first was the belated contention of the Government that this was a "thin" corporation so that the large advances to

the corporation constituted a contribution to capital and not a debt on which interest could be paid and deducted.[1] The second was the contention there primarily, here secondarily, urged by the Taxpayer that even though interest must be accrued to each of the three previous years there was a constructive receipt of income by the payee so that the timely election by payer and payee under the Technical Changes Act of 1953[2] made the deduction by the payor proper and consequently the carry forward of the loss was permitted. The District Court concluded that it was a debt giving rise to interest and, more or less as a matter of course, assumed it had to be accrued in each of the years. It also held that there had not been a constructive receipt by the payee so the election was ineffectual.

We do not disturb either of these conclusions.[3] We do, however, hold that within the applicable clearly erroneous concept embodied in F.R.Civ.P. 52(a), 28 U.S.C.A., the District Court's implied finding is contrary to the right of this unique case and therefore may not stand. Bishop v. United States, 5 Cir., 1959, 266 F.2d 657, at page 666; Nye v. Lovelace, 5 Cir., 1956, 228 F.2d 599, at page 603; Sanders v. Leech, 5 Cir., 1946, 158 F.2d 486, at page 487. In reaching this we do not make credibility choices at variance with those made by the Trial Judge. Indeed, the record is virtually without substantial contradiction. Cf. Baldwin v. Morgan, 5 Cir., 1961, 287 F.2d 750, at page 752; Riedel v. Commissioner, 5 Cir., 1958, 261 F.2d 371, at page 372; Raymond Pearson Motor Co. v. Commissioner, 5 Cir., 1957, 246 F.2d 509, at page 513; Goldberg v. Commissioner, 5 Cir., 1955, 223 F.2d 709, at pages 711–713.

War cuts a big figure in this case. It was the aftermath of World War II which brought all of this into being. It was the Korean War which produced the income now taxed. It all began in 1946. Alex Gounares, a naturalized citizen living in Alabama, had considerable savings produced out of the theater business. He was concerned about his brother Petros, a Greek citizen and a master mariner by trade. Greek shipping, as was the Greek economy, was at a very low ebb. The outlook for Petros was equally dismal. Alex conceived the idea that it would be good to acquire a vessel which Petros could command and through the shipping business find profitable and satisfying employment. Alex had thought that a small vessel costing about $25,000 could be obtained from American war surplus fleets. This turned out to be unavailing. He continued negotiations with the United States Maritime Commission under the Ship Sales Act of 1946, 61 Stat. 449. Instead of a small vessel originally hoped for, Alex became the successful bidder for a Hog Island vessel which had practically passed through two wars and two names. The vessel was certainly approaching, if she had not reached, the "twilight of her life." Ionion S.S. Co. of Athens v. United Distillers of America, Inc., 5 Cir., 1956, 236 F.2d 78, at page 81, 1956 A.M.C. 1750, at page 1753. Shortly he received the bill of sale covering the S. S. William R. Gibson (ex-West Segovia). The terms of sale permitted transfer to the Panamanian registry and flag. She cost $231,611. From the proceeds of savings bonds which he sold, and a $75,-

---

1. The Court discussed our cases of Rowan v. United States, 5 Cir., 1955, 219 F.2d 51; Sun Properties, Inc. v. United States, 5 Cir., 1955, 220 F.2d 171; Camp Wolters Enterprises, Inc. v. Commissioner, 5 Cir., 1956, 230 F.2d 555; Aqualane Shores, Inc. v. Commissioner, 5 Cir., 1959, 269 F.2d 116.

2. Public Law 287, 83 Cong., 1st Sess., approved Aug. 15, 1953, § 202(a), 67 Stat. 617, amending par. (1) of Code § 24(c); see H.Rep. 894, Sen.Rep. 685, and H. Rep. 6426, 1953 U.S.Code Cong. & Admin.News, pp. 696, 2423; 13 (1953-2) Cum.Bull. 508, 510, 517.

3. We accept the conclusion of a debt, not capital contribution; we do not reach the election issue.

000 loan obtained on his individual credit from a local bank, Alex paid this purchase price in cash. Additional essential equipment to outfit the vessel brought the total sum to $245,031.39.

As a part of this plan, an Alabama corporation, Gounares Bros. & Co., here the Taxpayer, was formed on February 6, 1947, with a total authorized capital of $25,000.[4] The articles of incorporation expressly provided that the subscription of Alex was to be discharged by the transfer of the vessel which by now had acquired her third name, the S.S. Ourania Gounares. By the terms of the conveyance of the ship from Alex to the corporation, Alex was to have a preferred maritime mortgage covering after crediting the stock subscription, the purchase money paid and all other expenditures. But no mortgage was then, or ever, executed.

The corporation commenced operations in February 1947. Following a common practice in the maritime industry, it appointed a local shipping company as its managing agent whose compensation came largely from commissions on freights. The corporation had no source of credit. Whatever was needed was supplied by Alex. In its first year's operations, Alex, in addition to the initial purchase money, had advanced $61,643.-

15. After crediting stock subscription and repayments out of gross operating receipts, the amount due Alex on February 12, 1948, was $215,254.15. On that date the directors by formal resolution authorized the officers to execute a preferred ship mortgage under the Panamanian law to secure payment of a promissory note maturing in one year in like amount at 4% interest. Those papers were prepared by the corporation's maritime counsel but were never executed. From then until 1951 the amount due Alex was never lower. Indeed, the balance increased considerably.[5]

The reason for this was not difficult to see. The managing agents could find employment for the ship scarcely 50% of the time. And when employment was found, freights were barely able to pay operating costs, and what little remained was wiped out by shore-based sales and administrative overhead expenses.[6] Thus in four years' operations (1947–48–49–50), the vessel, which was the corporation's sole asset, produced losses aggregating $105,377.15. This figure did not include any amount for interest on the balances (note 5, supra) due Alex. Nor did this include any amount for salaries to Alex or other shareholders. It did include, however, wages paid to the crew including that paid to Petros as master.[7]

---

4. Of the 250 authorized shares, Alex subscribed for 150, his wife 25, his brother Harry 25, and Petros 50 shares. Actually the full $25,000 was paid in by Alex.

5. 
| End of Year | Amount due Alex |
|---|---|
| 1947 | $224,254.15 |
| 1948 | 242,284.85 |
| 1949 | 237,488.24 |
| 1950 | 251,486.39 |

6. For example, in the first year, February–December 31, 1947, the vessel had but three voyages with freight revenues aggregating $391,903.35. Voyage, vessel, cargo, port, commission and brokerage expenses totaled $379,765.15 leaving a voyage operating profit of $12,138.19. After deducting administrative expense and unrecoverable ship damage (no depreciation was charged off in 1947), the loss for the year was $3,796.67. The year 1948 was worse. With operating revenues from freights of $313,870.25 and expenses of $361,982.03, the loss was $36,543.47.

1949 was no better. Freight revenues totaled $366,127.97 with operating expenses of $392,951.32 and a net loss after adjustments of $25,604.59.

In 1950 it had nothing but expenses. By this time the corporate charter had been expanded to allow some theater operations which produced a net income of $4,644.58. Against this expenses growing out of the ownership and maintenance of the idle vessel totaled $44,-755.84 which, with minor adjustments, produced a net operating loss of $39,432.-42.

7. Nor was this affected by the controversy subsequently developing over the rate of depreciation which we discuss later. From 1947 through 1950 depreciation of

With continuously mounting operating losses accompanied by a decline (finally to zero) in business, the impact on the corporation's general solvency was obvious.[8] It was insolvent in every sense of the word. It avoided conduct as an insolvent only because the deficits were made up by further advances from Alex. Not surprising is it that at the close of 1950, the balance due Alex was at its peak in the sum of $251,486.39.

The venture was a complete and continuous failure. Things were not only bad, they were getting progressively worse. The year 1950 saw the vessel languish without a pound of cargo so far as the fiscal records reflect. In the meantime ordinary maintenance costs kept running on. No one has breathed even a faint suggestion that at that moment there was a single prospect that the vessel, or the corporation through her, would ever be able to break even, much less produce an operating profit. All that was left was the possibility of sale, but it is uncontradicted that all such efforts were unavailing.

It is in this setting that the accrual of interest as a deduction by the payor corporation must be judged. Several factors other than those discussed are significant and likewise uncontradicted. Alex was positive that interest (or principal) was to be paid only if the corporation had earnings. That meant only if the vessel, its sole productive asset, could operate at a profit. That meant that there was in fact no fixed, determinable amount or time of payment. Several things corroborated this. The books were carefully constructed by a certified

public accountant whose competency and professional responsibility is nowhere questioned. This same accountant prepared each of the income tax returns for the corporation. While the books and returns were generally established on an accrual basis and other items of income and expense were treated as accruals, the accountant made no such accrual as to the interest due Alex. And this is so even though the summary balance sheets reflected on the tax returns showed these large amounts (See note 5, supra) as "notes payable."[9] Likewise, though the matter was formally handled twice by the lawyers,[10] the continued indifference toward the execution of a formal promissory note, or more important, the preferred ship mortgage, reflects the understanding that Alex was to be repaid if and when, but only when, the corporation had earnings (or from proceeds of the sale if the vessel were sold).

■ Indeed, all of this is made plain by the District Judge's findings. He first said "In the present case there was no evidence introduced that the taxpayer could have paid [Alex] at the close of the years 1948, 1949 and 1950. As a matter of fact, the evidence is to the contrary. * * *." The Court went on, "There was no maturity date fixed for the obligation due him and the instruments evidencing the obligation were never executed; [Alex] was to be repaid only if the corporate venture was successful; the obligation was subordinate to the obligations owing to other creditors * * *." When regard is had to the type of business the corpora-

10% on a useful life of ten years was claimed. No objection was raised as to this.

8. The balance sheets, accepted as reliable, showed the following growing deficits at the years' endings:

| 1948 | $40,340.14 |
| 1949 | 65,944.73 |
| 1950 | 98,054.87 |

9. As to the underlying actual book entries, the District Court in its opinion commented: "The evidence is conflict-

ing as to the bookkeeping entry which the taxpayer used to show this transfer. Testimony of witnesses was to the effect that the entry appeared as 'note payable,' 'notes payable,' 'due Alex Gounares,' or just a debt." [185 F.Supp. 796]

10. This was referred to first in the conveyance from Alex to the corporation and second in the formal resolutions adopted over a year later in the February 12, 1948, meeting of the Board of Directors.

tion was engaged in, the latter statement that "the obligation was subordinate to the obligations owing to other creditors * * *" is completely accurate even though there was no formal subordination agreement. The corporation's sole productive asset was the S.S. Ourania Gounares. While she plied the seven seas or languished idle at the dock, she was subject to preferred maritime liens for crew's wages, supplies and services.[11]

46 U.S.C.A. §§ 971–975, § 953. Merchants & Marine Bank v. The T. E. Welles, 5 Cir., 1961, 289 F.2d 188; Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co., 5 Cir., 1958, 261 F.2d 861, 1959 A.M.C. 148. Until such time as a preferred ship mortgage was properly executed and recorded and its preferred status established as a matter of Panamanian or United States law or both,[12] it was as plain as the vessel's name and home port across her stern that Alex was outranked by hundreds of thousands of dollars of maritime liens.

Finally, this understanding of payment when and as, but only when and as, earnings were available is corroborated by the sheer financial realities of this enterprise which was born of a desire to help one's kin. No one knew better than Alex that he, and he alone, was the source of money, or credit, or both. In his initial efforts, he had learned that the banks would loan to him, but not to any corporation to be formed. Consequently, he knew that to expressly provide that he should be paid his interest precisely when due without regard to actual earnings meant that he would have to supply the funds with which to pay money (interest) to him on which to pay income taxes to the Government. No one has suggested that he, or anyone else, would seriously have entertained any such program.

When, as we did in Guardian Investment Corp. v. Phinney, 5 Cir., 1958, 253 F.2d 326, we look at the entire picture, it is plain that there was no basis for accrual of this interest in the years 1947, 1948, 1949 and 1950. It is not as the Government urges, a simple case of a financial inability to pay, cf. Fahs v. Martin, 5 Cir., 1955, 224 F.2d 387, 393; Miller & Vidor Lumber Co. v. Commissioner, 5 Cir., 1930, 39 F.2d 890, 892. There is in this record a demonstrated incapacity to pay in fact under circumstances known to the creditor which made it certain from the outset that payment could—hence would—be made only as actual earnings permitted.[13] Where there is no substantial expectation that payment could be made during the period, and on the contrary the facts are overwhelmingly convincing that the interest payments could not be made, the payor may not accrue it as a deduction[14] nor is an accrual basis payee required to accrue it as income.[15] See also

11. Voyage and operating expenses were paid by the managing agent out of freight revenues collected. These included substantial sums (see note 6, supra) for crew's wages, ship stores, fuel, water, repairs, stevedoring, wharfage, dockage, pilotage, towage, tonnage and canal dues, quarantine, custom and consular fees and the like, all of which have a presumptive status as a preferred maritime lien. 46 U.S.C.A. §§ 971–975, § 953.

12. See Gilmore & Black, Law of Admiralty § 9–51 at 576–579, § 9–70 at 612–614.

13. The record here shows convincingly that this is not merely a case in which "interest legally owed * * * by an insolvent accrual basis taxpayer" is "unlikely to be paid * * * by reason of * * * insolvency" as was true in

Fahs v. Martin, supra, 224 F.2d 387, at page 393.

14. William A. Clark, B.T.A. Memo Docket 107120—1942 (PH 1942 B.T.A. Memo Decisions 42,354); Zimmerman Steel Co., 45 B.T.A. 1041, reversed 8 Cir., 1942, 130 F.2d 1011, 143 A.L.R. 1054; Florence Pearlman, 4 T.C. 34; Millar Brainard, 7 T.C. 1180.

15. Great Northern Ry. Co. v. Commissioner, 8 B.T.A. 225, at page 229; Mertens, Law of Federal Income Taxation § 12.75 and § 12.95; Turners Falls Power & Electric Co., 15 B.T.A. 983; Corn Exchange Bank v. United States, 2 Cir., 1930, 37 F.2d 34; Estate of George Herder, 36 B.T.A. 934, affirmed in part and reversed in part on other issues, 1939, 70 App.D.C. 287, 106 F.2d 153, certio-

as to other contingencies affecting the likelihood of payment or receipt United States v. Virgin, 5 Cir., 1956, 230 F.2d 880; Pierce Estates, Inc. v. Commissioner, 3 Cir., 1952, 195 F.2d 475; Prudence Securities Corp. v. Commissioner, 2 Cir., 1943, 135 F.2d 340.

■ Of course it was this envisaged contingency—the making of profits—which transpired in 1951. The happening of that contingency fixed the obligation to repay principal and pay interest and at the same time it afforded the means by which to accomplish payment. It was, of course, wholly fortuitous. The Korean War—certainly an event contemplated neither in 1947 nor in 1950—revived history's old lesson. The demand for merchant shipping was acute, and where in 1950 the S.S. Ourania Gounares was a drug on the market and a dead loss to her owners, she proceeded to earn freight revenues aggregating $737,319.38 producing a net profit for the corporation of $158,351.44. From these earnings, the corporation reduced the principal indebtedness due Alex to $63,563.64. It paid to him $52,227.43 as interest and deducted the entire amount in 1951. For the reasons indicated we hold this was proper and the District Court's conclusion to the contrary must be reversed.

■ We think, however, that the District Court had adequate support in the record for its conclusions on depreciation. The Taxpayer has not shown the Court to have been in error in fixing the amount of salvage at $17,000 and, of course, some allowance is required. Treasury Regulation 111, § 29.23(1)–1; United States v. Massey Motors, 5 Cir., 1960, 264 F.2d 552, affirmed 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592. Nor did Taxpayer establish that with the overwork imposed upon this old hulk during the Korean emergency which kept her going night and day, her useful life for a vessel her age was being further reduced by this excessive travail so as to warrant an increase from a 10% to a 20% depreciation figure for 1951 and 1952.

The result is that the case must be reversed and remanded with respect to the accrual of interest for further and consistent proceedings. In all other respects the judgment is affirmed.

Reversed and remanded in part and affirmed in part.

rari denied 308 U.S. 617, 60 S.Ct. 262, 84 L.Ed. 515; Clifton Manufacturing Co. v. Commissioner, 4 Cir., 1943, 137 F.2d 290, at page 292, 150 A.L.R. 749; Chicago & North Western Ry. Co., 29 T.C. 989 (CCH Dec. 22, 867); Society Brand Clothes, Inc., 18 T.C. 304.