**UNITED STATES of America,**
**Appellant,**

v.

**Shelby LANGSTON, Appellee.**

**No. 19115.**

United States Court of Appeals
Fifth Circuit.

Oct. 10, 1962.

John R. Brown, Circuit Judge, dissented.

**730**

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., Miami, Fla., Joseph Kovner, Atty., Dept. of Justice, John B. Jones, Acting Asst. Atty. Gen., I. Henry Kutz, John A. Bailey, Attys., Dept. of Justice, Washington, D. C., Lavinia L. Redd, Asst. U. S. Atty., for appellant.

Robert Paul, George H. Salley, Miami, Fla., for appellee.

Before TUTTLE, Chief Judge, and BROWN and BELL, Circuit Judges.

TUTTLE, Chief Judge.

The United States appeals from a judgment entered by the district court without a jury granting the appellee a refund of federal income taxes. The sole issue before the trial court, and thus the sole issue before us, is whether when there is a flat sale of bonds together with accrued interest thereon, which interest accrued after the seller acquired the bonds, that part of the flat sale price which is attributable to such accrued interest must be treated by a cash basis taxpayer as a realization of accrued interest and be taxed to the seller as ordinary income rather than as a capital gain.

The facts are not in dispute. On August 1, 1950, the taxpayer purchased "flat"[1] $100,000 face amount of Missouri Pacific Railroad Company bonds for $107,827.60. At the time of the acquisition of these bonds by the taxpayer, there were accrued and unpaid interest coupons in the sum of $42,500. During taxpayer's holding period, $35,000 of this past due interest was paid and an additional $17,638.89 of interest accrued. The taxpayer sold the same bonds "flat" for $107,382.40 in 1954. In his 1954 income tax return taxpayer, who was on a cash basis, then reported the sale of the bonds as a long-term capital gain, the gain being the difference between the sales price $107,382.40 and his adjusted basis of $72,827.60, less his expenses of sale of $1,000, or a gain of $33,554.80.

The Commissioner asserted a deficiency based upon his contention that part of the total gain of $33,554.80 represented a sale of the defaulted interest which had accrued during the taxpayer's holding period. The Commissioner allocated the gain as between face amount of bonds and the accrued interest, and determined that the taxpayer had realized $15,136.03 as interest income upon the sale of the bonds with the unpaid coupons attached.

There are several legal principles as to which there seems to be complete agreement as between the parties. The first of these is that when Langston received $35,000 from the Missouri Pacific Railroad Company in payment of coupons that had been in default at the time he acquired the bonds, he was not required to report this as interest but

1. The term "flat" as used in this opinion has no legal significance. It simply means that a purchase was made at a stated price for bonds that had unpaid coupons attached, but without any specified allocation as to how the price was computed as between principal and interest.

was entitled to consider it as a return of capital, thus reducing his basis in the bonds. McDonald v. Commissioner, 6 Cir., 217 F.2d 475; Clyde C. Pierce Corporation v. Commissioner, 5 Cir., 120 F.2d 206. The second is that a taxpayer may not avoid reporting as income interest payments that are about to fall due and as to which there is no speculative factor by transferring them to another who collects the interest, Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75. The same principle applies with respect to the transfer of other anticipated income, Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743; Floyd v. Scofield, 5 Cir., 193 F.2d 594. A third principle that seems to be agreed upon by the parties here is that if the bonds were sold on terms that prescribed a stated amount for principal and a stated amount for interest, the amount paid for interest would be taxable as ordinary income.

■ It seems, therefore, that the questions that arise under the agreed state of facts here are: (1) whether the failure to specify a part of the sales price by the taxpayer, as being the amount paid by the purchaser for the unpaid interest coupons, changes the character of the proper proportion of the sales price which would truly represent the amount so paid from interest to capital, and (2), whether, if such "flat" sale does not have the effect of converting what would otherwise be interest into capital, may the Commissioner make an allocation in the manner in which he did in this case.

It is not contested by the taxpayer here that if he had been on an accrual basis of reporting his income he would have had to report the full amount of the accrued and unpaid coupons during his holding period as income, nor is it denied that the effect of the treatment argued for by the taxpayer here would have the effect of eliminating this interest income forever from treatment as income either in the hands of the taxpayer or a subsequent purchaser. The Government strongly stresses this feature of the case,

saying that the manner in which the cash basis taxpayer realizes his gain should not be permitted to give him a benefit that would in effect change an interest payment into a return of capital, whereas an accrual basis taxpayer could under no circumstances place himself in the same situation.

We conclude that if the state of the record was susceptible of a determination by the Commissioner that the above par price received by the taxpayer for the bonds truly represented some payment for the past due interest coupons that had accrued during the holding period of the taxpayer, then there was such realization by the taxpayer of income as would require his reporting it as ordinary income. We think the case of Fisher v. Commissioner, 6 Cir., 209 F.2d 513, is directly in point. In that case the taxpayer sold promissory notes with past due interest, which had accrued during the time of his holding the notes, for something more than the face amount of the notes. The Court of Appeals for the Sixth Circuit affirmed the judgment of the Tax Court, which had held that the gain must be allocated as between a return of capital and a realization of income. We find that nothing in this decision is in conflict with the opinion of this Court in Clyde C. Pierce Corporation v. Commissioner, 5 Cir., 120 F.2d 206, because in that case this Court merely dealt with the treatment of payments received by taxpayer on interest coupons which had accrued prior to his acquisition of the bonds. See also in this connection, First Kentucky Co. v. Gray, D.C., 190 F.Supp. 824 (on appeal to the Court of Appeals, 6 Cir.), and Jaglom v. Commissioner, 36 T.C. 126. See also Tunnell v. United States, 3 Cir., 259 F.2d 916, where it is stated on page 919:

> "The general rule is that a right to receive ordinary income, produced by a capital asset, is not transmuted into a capital asset by the sale or assignment of the capital asset together with the right to receive the ordinary income."

Turning now to the question whether the record before the district court warranted that court in rejecting the Commissioner's determination that a part of the sales price for the bonds represented a payment for the interest coupons, we need only turn to the brief of the appellee in this Court, where it is stated:

> "The sales price represents a price for the entire unit—*principal and defaulted interest.* The purchaser speculates that defaulted interest will be paid during his holding period, or if not, that the expectation of such future payments (that is of the defaulted interest) will cause the market value of his bonds to increase. The purchaser buys the bond *plus the expectation.*" (Emphasis added.)

Thus it seems clear that the taxpayer concedes that he received on the sale of his bond, a price which included the worth of the principal amount of the indebtedness plus something for the unpaid interest coupons. Clearly, therefore, a determination to that effect by the Commissioner was thoroughly justified. If the taxpayer considered that the Commissioner's method of allocating the gain as between the interest coupons that accrued during the holding period of the taxpayer and the principal of the bonds was improper, the burden was on him to undertake to show by proof what would be a fair allocation. The taxpayer does not argue that the allocation was unfair or unrealistic as such; he merely takes the position that since the parties themselves did not break the sales price down into the two elements, which the taxpayer concedes went into its total, the action of the Commissioner was arbitrary and unjustified.

The failure of the taxpayer to bring forward any proof undertaking to show that, contrary to the Commissioner's determination, the bonds themselves, on account of the favorable rate of interest they bore, or because of some other particularly valuable characteristic which they possessed, were themselves worth more than par, required that the district court approve the determination of the Commissioner as to this matter. The Commissioner's determination, in light of the fact that $35,000 of the $42,500 of coupons in default at the time of Langston's purchase were paid during this taxpayer's holding period of about four years, and in view of the fact that past due coupons were payable before any payment on principal, has ample support to place the burden on the taxpayer to challenge it if he disagreed with the allocation figures. The judgment of the trial court is reversed and the case remanded for the entry of a judgment for the United States.[2]

JOHN R. BROWN, Circuit Judge (dissenting).

My disagreement with the majority is not strictly so much over legal principles as it is concerning the operation of economic laws in the bond market. In essence the Court's thesis is that in the absence of compelling controverting proof the Commissioner had in effect determined that "the bonds themselves [a], on account of the favorable rate of interest they bore, or because of [b] some other particularly valuable characteristic which they possessed, were themselves *worth more than par* * * *"[1] (Emphasis supplied).

Before discussing factor [a], some comment is warranted as to [b]. If a piece of property has, as the Court puts it, "some * * * particularly valuable characteristic" which gives it an attraction in the market, surely the seller is not taxed on that portion which some expert appraiser might consider reflected the favorable income earning capacity of the property. Thus corporate stock which

---

2. Subsequent to the time this opinion was prepared and its filing deferred pending filing of the dissent, the Second Circuit reached this same conclusion in Jaglom v. Commissioner, 2 Cir. 1962, 303 F.2d 847.

1. For convenience in reference, the letters in brackets have been added.

has gained greatly in quoted value because of long accumulation of current earnings, is not, in the process of calculating the seller's income tax liability, broken down into ordinary income and capital gain by reason of the expectation of advantageous distribution of earnings in the future. Consequently, this element [b] in my judgment has no individual legal signification as the Court's alternative statement would seem to indicate. By that I do not mean to imply that as a matter of market place economics, such an element is of no importance. Quite to the contrary, it is just such things which go to make up the sales price which in turn accounts for the gain over cost or adjusted basis.

Thus it is that the so-called excess of price over "par" in this transaction may well have represented a " * * * particularly valuable characteristic" which these defaulted bonds had. The purchaser was not therefore simply buying accrued, but unpaid (defaulted), interest similar to the transfer of interest coupons in Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75. What the purchaser was acquiring was the unique and extraordinarily favorable tax advantage which, without dispute, enabled him to treat the ultimate receipt of accrued defaulted interest (up to the date of his purchase) as a return of capital, thus reducing his basis making the receipt either tax free or limited to capital gains rate.[2]

Obviously property with that unique attribute has—or in the market place at least may have—an unusual value. Certainly this is so in this world of high taxes where nearly every business transaction must be scrutinized in terms of net cost or effect depending on its income taxability.[3] A bond having a face value of, say, $100 which has the prospect of ultimately paying principal and, more so, a substantial portion of accumulated defaulted interest which need not be treated as income by the acquiring purchaser, is something quite different from an ordinary non-defaulted industrial or governmental bond whose sale transfers (a) complete ownership in the contract and (b) under practices of the bond market, accrued interest up to the date of the sale. If that unique element gives the defaulted bond a marketability in excess of basis, how is it to be treated by the seller? Of course he may not claim that it is to be entirely tax free. But why should that portion of its unusual market price be attributed to the mere sale of income (and hence taxable as ordinary income) when no such consequences would result where the sales price is higher because of any one or more or all of the actual or psychological influences, factors or even rumors which are a part of our complex securities market and

2. This result is more than, as the Court describes it, a "complete agreement" between the parties. Moreover, it does not depend on court-made principles, such as McDonald v. Commissioner, 6 Cir. 1954, 217 F.2d 475; Clyde C. Pierce Corp. v. Commissioner, 5 Cir. 1941, 120 F.2d 206. Rather, it rests on a specific Treasury Regulation:

"§ 1.61–7 Interest.
" * * *
"(c) Obligations bought at a discount; bonds bought when interest defaulted or accrued.— * * *
"If a taxpayer purchases bonds when interest has been defaulted or when the interest has accrued but has not been paid, any interest which is in arrears but has accrued at the time of purchase is not income and is not taxable as interest if subsequently paid. Such payments are returns of capital which reduce the remaining cost basis. Interest which accrues after the date of purchase, however, is taxable interest income for the year in which received or accrued (depending on the method of accounting used by the taxpayer). * * *."

3. The actual sales price which the seller receives may well be increased because of the favorable tax treatment which the transaction will have as to the purchaser. See, e. g., transfer of oil, gas or minerals in which the transaction is handled by the reservation of a production or oil payment. United States v. Witte, 5 Cir. 1962, 306 F.2d 81. Other examples are readily envisaged, such as certain tax free exchanges, acquisition of a loss corporation for a valid, non-tax, business purpose by the acquirer, etc.

which cause wide fluctuations in the price of even blue chip stocks and bonds?

My main criticism, however, is with element [a] especially since it runs through nearly every conclusion reached by the Court. Element [a] is that "the bonds * * * on account of the favorable rate of interest they bore * * *" were " * * * *worth more than par*."

The term "par" as the Court uses it is bound to refer to the nominal face value of the bonds. The record skimpy as it is, presumably puts this at $100,000. Curiously, Taxpayer did not purchase the bonds at "par." Rather, as the Court's opinion and the stipulation reflects, the 1950 purchase was for $107,827.60. The same bonds were sold four years later in 1954 for $107,382.40. This was, of course, $500 less than paid. Consequently, when viewed from the standpoint of the price *paid* for the bond and the price *received* on the sale of the bond, there was no gain whatsoever. That, by reason of the operation of the Regulation (see note 2, supra), there is a reduction in basis to $72,827.60, does not have anything to do with its marketable value as between the seller and the buyer. This was an internal adjustment wholly coincidental in nature and occurrence which concerned the seller alone. Yet, as I understand it, it is the Court's thesis that when the seller paid the sum of $107,382.40 in 1954, it was "the favorable rate of interest" which caused the purchasers to pay "more than par." But certainly on this record here is no factual basis for any such conclusion. And, sweeping as is the presumptive correctness of the Commissioner's "determination," neither is there any adequate record foundation for an implied determination to that effect by the Commissioner.

That is highlighted by the total absence of any information about these bonds. We do not know their date of issue or their maturity date, nor do we (or the Commissioner) know the coupon rate which the bonds bore. And yet these factors are essential in determining the price at which a bond is sold. For in the usual situation a bond " *   * sells at a price that makes the yield attractive to the purchaser to buy and to the holder to sell. The price reflects current thinking as to the yield for that particular security dependent upon the market's evaluation of its investment quality at the moment. The yield does not result from the fact that a bond is selling at a certain price. Rather, the bond is selling at a price to give it the resultant yield required by investors at that particular time." Bellemore, Investments 173 (2d ed. 1960). As the Court is considering solely the question of taxability of either actual or vicarious interest, rather than the taxability of any gains representing any other unique characteristics, it is dealing directly, immediately and solely with the yield. That, however, requires three factors. "A bond price is only one of three factors determining the yield. The two other factors are the nominal or coupon rate of interest and the length of time to maturity." Id. at 175. Here, of course, the record reflects nothing but the price ($107,827.60 at purchase and a sales price of $107,382.40).

This is more than a matter of academic importance from the standpoint of economics. The acknowledged fact is that the price of the bond depends on these several factors which at first blush seem to act in reverse. Thus, assuming a bond in the face amount of $100, a market price of $107 may reflect several things only one of which is the coupon—or as the Court puts it, the " *   * * favorable rate of interest."

As an economic proposition, it is clear that as the interest level in the money market decreases, the price of the bond goes up. On the other hand, when the going interest level increases, the price of the bond goes down.[4] The immutable

4. There are, obviously, risks other than the interest risk which affects the quality of the bond and hence its market acceptability (and price). And of course, bonds in default may present specific factors which might depress the price, although that was not the case on this record. But the operation of these economic

operation of these economic factors is now (and recently) recognized in the law. Hanover Bank, Executor v. Commissioner, 1962, 369 U.S. 672, 82 S.Ct. 1080, 8 L.Ed.2d 187, 191; and see United States v. Harrison, 5 Cir. 1962, 304 F.2d 835, 838, concurring opinion.

This is important because the Court's decision rests entirely upon the Commissioner's determination. The Commissioner's determination, though confessedly coming to us with presumptive correctness, must finally have some support. And where analysis shows that it is totally unsupported, our prior decisions teach that the Commissioner's determination must be disregarded. Phillips' Estate v. Commissioner, 5 Cir., 1957, 246

F.2d 209, 212, 214. But on this record the Commissioner's determination actually turns out to be without any factual support whatsoever, and it is equally lacking in support as a matter of economic principles. Resting on this unstable foundation the Court's reasoning seems to be that since the price paid to the seller (Taxpayer) exceeded "par," it represented a payment for income (that is interest). But Holder No. (2) of a bond not in default which he purchased at, say, $103 would hardly be taxed for ordinary income as to the 3 point gain if, at the time of his sale three years later to Holder No. (3), the market price was $106 because of an intervening decrease in the market interest level.[5] And

principles is best understood in terms of bonds not in default. Bellemore points out that "The price of bonds * * * fluctuate[s] with changes in money rates. With the higher grade bonds this should be the sole cause of fluctuations in market price. * * * If interest rates fall, bond prices rise and vice versa." Bellemore, Investments 6 (2d ed. 1960). The author repeats: "If interest rates rise these securities will fall in price and if interest rates fall, they will rise in price." Id. at 54. This is the interest rate risk. "The interest rate risk, on the other hand, is the risk that interest rates will rise after the bond is purchased and its market price will decline accordingly." Id. at 148. Since the "coupon" rate is fixed, changes in demand for money are reflected in the price. "There is a difference between the contract or 'coupon' or 'nominal' rate of return on borrowed funds as opposed to the 'yield' or going rate on these funds. * * * The 'yield' is the actual rate of return realized * * * if securities are purchased at a specific price. * * *." Id. at 46. And the "* * * yield fluctuates automatically with the price paid for the bond * * *." Id. at 132. The operation of these principles is illustrated by performance and effect of Government bonds which, by and large, are, except for the interest rate risk, riskless investments. As to these "* * * it must be remembered that even the highest grade bonds, such as United States government bonds, fluctuate in price, and long-term governments have fallen as much as 10 points in six months." Id. at 147. As Government bonds "are the closest to a riskless investment from the

aspect of credit risk * * *," the "* * * yield sets the basic interest rate for the rest of the investment market." Id. at 53. And this "basic interest rate fluctuates up and down in line with normal, and especially in recent years, certain artificial (the operations of the Federal Reserve and Treasury Department to control the pattern of interest rates) supply and demand factors. The fluctuation in interest rates results in changes in the price of securities * * *." Id. at 53. Because of this a bond purchaser, while gaining a safety advantage over equity securities, undergoes the disadvantage of (1) a lower return, (2) repayment in fixed dollars without an inflation hedge, and "(3) he will witness a *decline* in the market value of the bond, which may be substantial at any time that interest rates *rise* above the level existing at the time he purchased the bond; and (4) capital *appreciation* during the life of the bond * * * can only occur if interest rates *decline* * * * after the investor purchases the security." (Emphasis added.) Id. at 149.

5. Thus, on the standard tables (see Bellemore, pages 180–183), this would be substantially the result as to a bond maturing in 20 years with a coupon rate of 4.50% where the market interest level yield from date of purchase to date of sale decreases from 4.25% to 4.05%:

| To Yield | Price (20-year Maturity) |
|---|---|
| 4.05% | $106.1281 |
| 4.25% | 103.3457 |

The clearest example, of course, is the purchase of a 4.5% coupon bond 20-year

yet that is precisely what the Court has done here.[6]

That leaves but two further arguments advanced by the Court. The first is the emphasis on the quoted excerpt from the Taxpayer's brief. Far from being the devastating concession the Court's language attributes to it, this is just another expression of immutable economic laws which, whether we like it or not actually override Judge-made law.[7] In the sale of every bond two things are evaluated, (1) principal and (2) interest (whether accrued or in the future).[8]

The second thing is the contention that this result is right for a cash basis taxpayer since it would be so as to an accrual taxpayer. That is a fragile basis indeed. There is seldom, and frequently

maturity at $100 yielding 4.50 with a subsequent drop in the market interest level to 4.05% yield:

| To Yield | Price |
| --- | --- |
| 4.50% | $100.0000 |
| 4.05% | 106.1281 |

The purchase of a 4.5% coupon 20-year bond at market yields of 5.30% and a sale five years thereafter when the market level yield has dropped to 3.50% would be:

| To Yield | Price |
| --- | --- |
| 5.30% | $ 90.2079 |
| 3.50% | 114.2971 |

Presumably on the Court's theory, the difference between "par" ($100) and the sales price ($114.0473) would be income; perhaps it would go further and tax the difference between the price paid ($90.3484) and the price sold ($114.-0473).

6. The purchase price ($103 in the example) is here considered to be 72.8 ($107,827.60 less defaulted interest received reducing basis to $72,827.60); and the sales price ($106 in the example) is here the actual sales price 107 ($107,-382.40). The Commissioner allocated this gain, but the principle is the same whether part or all of it is considered income.

7. It is not likely that today Judges would ever go quite as far as did Justice Johnson concurring in Fletcher v. Peck, 1810, 6 Cranch 87, 142, 3 L.Ed. 162, 180:

there cannot be consistency as between these diverse theories of accounting. More specifically we and others have many times recognized that to an accrual basis creditor he need not accrue, and thus currently pay tax on, income due but in substantial default where there is a substantial doubt that it will ever be paid. Gounares Bros. & Co. v. United States, 5 Cir., 1961, 292 F.2d 79. This record is completely silent on the prospects for payment by this defunct railroad of interest accruing during Taxpayer's holding period.

As I see it, there is nothing but the Commissioner's implied determination, and I cannot join the Court's finding of income without factual support and contrary to economic principles. I therefore respectfully dissent.

"I do not hesitate to declare that a state does not possess the power of revoking its own grants. But I do it on a general principle, on the reason and nature of things: a principle which will impose laws even on the Deity."

8. "The value of any bond is determined by two elements. The buyer is purchasing the present value of the face of the bond plus the present value of a series of interest payments discounted according to their various due dates.1 The present worth of a right to receive $1000 principal value in 10 years is determined by compound discount, and is equivalent to the amount that would accumulate to $1,000 in 10 years at a compound interest rate that is equal to the prevailing rate of income return on similar securities. Likewise, the present worth of the coupons depends upon the aggregate amount of the payments, each of which is determined by the nominal interest rate, compound discounted at the yield rate to the present day. As the maturity date grows more distant, the less valuable becomes the present worth of the face value of the bond. Thus in most bonds with a maturity of over twelve years, and with all bonds with a maturity of over twenty years, the present worth of the coupons exceeds the present worth of the principal amount." Bellemore, Investments 177–8 (2d ed. 1960). In his footnote 1, the author quotes from Wright, Crocker, Taking the Mystery Out of Bond Yields, Tucker, Anthony & R. L. Day.