331 F.2d 879
 Robert P. K. HORST and Harry H. Wiggins, as Executors of the Last Will and Testament of Paul R. G. Horst, and Robert P. K. Horst, as Executor of the Last Will and Testament of Anna C. Horst
v.
The UNITED STATES.
Robert P. K. HORST and Harry H. Wiggins, as Executors of the Last Will and Testament of Paul R. G. Horst
v.
The UNITED STATES.
 No. 300-61.
 No. 117-62.
 United States Court of Claims.
 May 15, 1964.
 
 Harman Hawkins, New York City, for plaintiff. Duer, Strong & Whitehead, New York City, were on the briefs.
 S. Laurence Shaiman, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner, and Philip R. Miller, Washington, D. C., were on the brief.
 Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.
 DAVIS, Judge.
 
 
 1
 These companion income tax cases call upon us to construe and apply the war loss provisions of the 1939 and 1954 Internal Revenue Codes.[1] Under Section 127 of the 1939 Code (carried over into Sections 1331-1336 of the 1954 Code), property owned by Americans in enemy countries (including interests in such property represented by securities) was deemed to be destroyed or lost upon the declaration of war — without regard to the possible return of the property, or an award of compensation, at the war's end. The taxpayer could immediately take a war loss deduction for such enemy-held property to the extent the deduction would do him any good.[2] The entire property was thereafter deemed, until recovered, non-existent for all income tax purposes (whether or not a war loss deduction was taken); it was treated as if the taxpayer no longer had any interest in it. Shahmoon v. Commissioner, 185 F.2d 384 (C.A. 2, 1950) (no depreciation allowed after war loss deduction); Kenmore v. Commissioner, 205 F.2d 90 (C.A. 2, 1953) (no fire loss allowed); Weinmann v. United States, 278 F.2d 474 (C.A. 2, 1960); Wyman v. United States, 166 F.Supp. 766, 143 Ct. Cl. 846 (1958); Dix v. Commissioner, 34 T.C. 837, 841 (1960). During the time of loss there was a complete void; the statute "is to be read as though the property had ceased to exist during the period of enemy occupation." Kenmore, supra, 205 F.2d at 92. After the close of hostilities, however, it was anticipated that there could be a recovery of the war loss through repossession of the lost property or its equivalent; the Code covers the incidents and operation of such a recovery. The basis of property recovered "in respect of" war-lost property is expressly established as "an amount equal to the fair market value of such property, determined as of the date of the recovery."[3] The recovery must be used in computing gain (in the year of recovery) but there is no taxable income until the taxpayer's total war loss recovery exceeds his unused war loss (that part of the potential war loss deduction which did not result in a tax benefit). The part of that excess which is equivalent to the amount used for a tax benefit at the time of the war loss deduction is then taxed as ordinary income; the remainder is handled as gain from an involuntary conversion (taxed at capital gain rates, if at all).
 
 
 2
 When this country entered World War II in December 1941, Paul R. G. Horst (whom we shall designate the taxpayer) owned a sizeable amount of Japanese and Italian bonds. Under the Code's war loss provisions, his total loss on those bonds was $746,459.25,[4] but, since his 1941 income was much smaller, he received a tax benefit from only a minor part ($99,923.22) of this total; his "unused war loss" amounted to the difference ($646,536.03). After the war, he had a war loss recovery, it is agreed, in 1947 "in respect of" his Italian bonds (not now involved), and in 1950 for his Japanese bonds. The total basis of the property included in these recoveries was $425,891.94. Since this was considerably less than his unused war loss, he was not required to pay a tax on the recovery.
 
 
 3
 The recovery "in respect of" the Japanese bonds occurred in November 1950 when trading restrictions on those securities were lifted and trading recommenced after almost a decade. At that time, the bonds, on which no interest had been paid since 1941, were traded flat, i. e., the quoted price included both principal and accrued but unpaid interest. This combined market value amounted, in November 1950, to $251,146.25. As we have pointed out, this sum, taken together with the earlier recovery on the Italian bonds, was considerably less than the taxpayer's unused war loss for 1941.
 
 
 4
 Service on the Japanese instruments was not resumed until after December 22, 1952, when the Japanese Government (which had taken over all the obligations) offered to extend for ten years the maturity date on each bond, as well as on each accrued but unpaid interest coupon; the extended coupons were to be detached and treated separately from their bonds. This taxpayer accepted the offer and received extended bonds and interest coupons. Later, as the coupons which were matured but unpaid in November 1950 were honored (in 1952-1959), he reported these payments as ordinary income in the years of receipt. He also paid income tax on the coupons (and other interest obligations) which had not yet accrued by November 1950.
 
 
 5
 In the present suits, the plaintiffs seek refunds of the taxes collected on the payments of the accrued but unpaid coupons (but not of the taxes paid on the interest accruing after November 1950). The taxpayer's position is that, under the war loss statute and the accepted rule relating to the acquisition of bonds flat, these late payments were returns of capital, not taxable income. Defendant insists that the interest payments were necessarily income by their very nature.
 
 
 6
 This question cannot be properly decided, in our view, by resting on unanchored general principles tied to the ordinary status of interest payments, while at the same time disregarding the special tax scheme established by Congress, first under the 1939 Code and then re-adopted in the 1954 Code, for World War II losses. That self-contained system is decisive; our problem must be solved within the circle of its detailed requirements.
 
 
 7
 In that special statute, Congress directed that, for federal income tax purposes, taxpayer's Japanese bonds be "considered as destroyed or seized" in 1941; as the cases (cited supra) uniformly hold, the war loss provisions demand that, whatever the law of contracts or of negotiable instruments may say, we must act as if thereafter he had no such property until 1950. When in that year he had a war loss recovery "in respect of" his lost property, the bonds were being traded flat and their market value included the worth of the defaulted interest coupons. The statute specifically declares that taxpayer's basis for the recovered property is "the fair market value of such property, determined as of the date of the recovery." This new value, including the unseparated portion attributable to the accrued but unpaid interest, was utilized in computing the taxpayer's income for 1950, but he did not have to pay any tax thereon because his total war loss exceeded his total recovery. Nevertheless, the recovery was taken into account, and had to be taken into account, in determining his taxable income. Having thus passed through the income tax strainer, the bonds became capital assets, with a single basis reflecting both principal and defaulted interest (because that is what the "fair market value" of the property embraced on the recovery date). Under one of the fundamental principles of income taxation, the taxpayer is entitled to a full return of this basis before being taxed on any gain. It is also settled that those who purchase, flat, bonds with defaulted interest coupons are not required to treat later interest payments as ordinary income; the payments are but partial returns of the investment in the securities. Campbell v. Sailer, 224 F.2d 641 (C.A. 5, 1955); National City Lines, Inc. v. United States, 197 F.2d 754, 756, 757 (C.A. 3, 1952); Clyde C. Pierce Corp. v. Commissioner, 120 F.2d 206 (C.A. 5, 1941); Rickaby v. Commissioner, 27 T.C. 886 (1957) (acq. 1960-2 C.B. 6). See, also, United States v. Langston, 308 F.2d 729, 730-731 (C.A. 5, 1962); Jaglom v. Commissioner, 303 F.2d 847, 849-850 (C.A. 2, 1962); McDonald v. Commissioner, 217 F.2d 475, 476 (C.A. 6, 1954). Similarly this taxpayer's acquisition of the bonds flat in 1950 (via the war-loss-recovery statute) entitles him to recover, free of tax, the capital which became his in that year, under the special system Congress established.
 
 
 8
 We see no sufficient reason why the well-entrenched flat purchase rule should be avoided here. The taxpayer was not a purchaser, and he did not buy the bonds in 1950. By force of the statute, however, he was a "war loss recoverer" who has to be treated as if he had newly acquired the property at its fair market value in 1950. The theory of the flat purchase rule — that one who receives a bond along with accrued but unpaid interest obtains a single piece of property, not part capital and part income — fits squarely with this statutory acquisition Congress created for a war loss recoverer. The defendant counters that the rule's true rationale is that the later payment to the purchaser of pre-existing defaulted interest is not a payment for the use of his money but merely satisfaction of an obligation already owing at the time he bought the bond; on the other hand, the like payments here, it is said, were for the use of taxpayer's money (lent to the Japanese before the war) and must therefore be deemed income. This argument turns its back on the war loss statute which erases, for tax purposes, the taxpayer's prior property and transactions, once he has a war loss; from then until the time of recovery there is, in effect, a vacuum for the world of the income tax; as of the recovery, the recoverer is placed in the same position taxwise as the purchaser of bonds flat — the accrued interest is an obligation owing at the time he acquires or reacquires the bonds. There is no relevant distinction between the purchaser of bonds flat and the war loss recoverer.
 
 
 9
 The force of the special statute likewise undermines the defendant's related arguments. When the taxpayer deducted his war loss on the Japanese bonds in 1941, he properly deducted only the cost of the bonds and not the subsequently accruing interest for the period 1942-1952; it is urged, therefore, that not only did the flat bonds of 1950 cover more than the property lost in 1941 but also that the part of the 1950 cost attributable to the defaulted interest necessarily represented something not lost at all in 1941. The answer is that the statute contemplates the recovery of property other than the precise war-lost items when it refers to property recovered "in respect of" property considered as destroyed or seized. A farm with substantial new improvements, added since the loss, would be recovered "in respect of" the old war-lost farm. The flat bonds are not dissimilar. The whole value of those instruments, principal plus accrued interest, represented the "property recovered in respect of property considered as destroyed or seized" — just as with the enhanced value of the improved farm. The former property carries along, and incorporates, its integral increments. Nor is it material that, in our situation, there is no one who will pay an income tax on the accrued interest if the taxpayer is now relieved.[5] The war loss statute, as we have explained, provides its own separate method for taxing recoveries. The recovery in 1950 had to be taken into account in determining the taxpayer's income tax for that year. In this instance, the formula provided by the statute happened to require no tax — because of the magnitude of the total war loss as compared to the useable deduction allowed for 1941 — but the legal situation would certainly be no different if the taxpayer had had to pay a tax on the defaulted interest at the time of recovery. In any event, the applicability of the flat purchase rule cannot depend on the existence of another party available to pay a tax on the "interest." A purchaser otherwise free of income tax on the interest, under the rule, would not become liable because his particular vendor happened to be exempt from the income tax (e. g., a diplomat or a nonprofit institution) or turned out to have large counterbalancing deductions.
 
 
 10
 Still another defense is that payment of the pre-1950 interest coupons cannot be held part of a capital transaction (giving rise to capital gain once basis has been returned) because there is no "sale or exchange." It is implicit in what we have said that one answer lies in the special war loss statute which both treats a war loss recoverer as newly acquiring the property and also instructs him to take the recovery into account in computing his income tax. A separate reply is given by Section 117(f) of the 1939 Code:
 
 
 11
 "For the purposes of this chapter, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor."[6]
 
 
 12
 This provision applies to the payment of accrued but defaulted interest on coupon bonds, as well as to principal, even though the taxpayer's basis has already been recovered. Campbell v. Sailer, supra, 224 F.2d 641, 643 (C.A. 5, 1955); Rickaby v. Commissioner, supra, 27 T.C. 886 (1957) (acq. 1960-2 C.B. 6); Rev.Rul. 60-284, 1960-2 C.B. 464. Through Section 117(f), any requirement that there be an "exchange" is met.[7]
 
 
 13
 Although on its surface Shafer v. United States, 204 F.Supp. 473 (S.D.Ohio, 1962), aff'd on opinion below, 312 F.2d 747 (C.A. 6, 1963), may appear to support defendant in actuality it does not. The plaintiffs point out that Shafer, unlike Horst, had elected to revert to his prewar-loss cost basis (see footnote 3, supra). That 1941 basis obviously did not reflect the subsequent defaulted interest; accordingly, when the after-accruing interest was belatedly paid, Shafer received income, not a return of his basis. This taxpayer, on the other hand, accepted the later date-of-recovery for his basis, and he is therefore entitled under the statute to recover the already-accrued interest reflected in that basis.
 
 
 14
 It follows, we think, that faithful adherence to the terms and implications of the war loss statute allows this taxpayer to treat the payments of the disputed defaulted interest as a return of capital and, once his basis was recovered, as capital gain, not ordinary income. That is what Congress has directed in enacting and re-enacting the legislation.
 
 
 15
 The parties are agreed, and we so hold, that for the three years involved in No. 117-62, the taxpayer was entitled to an exemption of $600 (for his non-resident alien wife) which he failed to take in his returns.
 
 
 16
 Plaintiffs are entitled to recover in both cases. The amount of recovery will be determined under Rule 47(c) (2).
 
 
 
 Notes:
 
 
 [1]
 The two suits present exactly the same war loss issue for different years, and we shall therefore treat them as a single case. In No. 117-62, there is also a minor issue upon which the parties are now agreed
 
 
 [2]
 The remainder of the loss became his "unused war loss."
 
 
 [3]
 Section 1336 of the 1954 Code provides in pertinent part:
 "The unadjusted basis of property recovered in respect of property considered as destroyed or seized under section 127 (a) of the Internal Revenue Code of 1939 shall be determined under this section. Such basis shall be an amount equal to the fair market value of such property, determined as of the date of the recovery, * * *."
 There is a comparable provision in Section 127(c) (3) (A) of the 1939 Code.
 Taxpayers recovering the same property were also given an election to choose the original basis of that property, if they so desired. That election was not made by the present taxpayer.
 
 
 [4]
 The statute required the taxpayer to treat his loss on the Japanese and Italian bonds as one integral loss, not as separate losses. This is true throughout the statutory scheme for war losses and war loss recoveries. The Japanese loss and the Italian loss must be considered as a unit
 
 
 [5]
 In flat purchase cases, the courts have held the seller liable for ordinary income tax on the portion of the flat price attributable to the accrued interest. Jaglom v. Commissioner, supra; United States v. Langston, supra; First Kentucky Co. v. Gray, 309 F.2d 845 (C.A.6, 1962)
 
 
 [6]
 For these cases, Section 1232(a) of the 1954 Code is substantially the same
 
 
 [7]
 In this connection, the Government raises a secondary defense, as to a portion of the tax, arising out of the double fact that, under the 1952 arrangement with Japan, the bonds could be redeemed by the obligor prior to their new maturity dates but the interest coupons were detached and given separate existence. Japan did redeem certain of the bonds early, while continuing to pay the detached coupons on their extended maturity dates. (Taxpayer received, from 1953 through 1959, a total of over $49,000 in payment for such coupons relating to previously-redeemed bonds. In each instance the redemption-amount exceeded the cost basis of the bonds and the related coupons.) The defendant maintains that, at the least, gain attributable to amounts received in payment of the interest coupons after redemption of the bonds to which they relate is taxable as ordinary income. We think, however, that all the interest coupons which were accrued by the time of the war loss recovery in 1950 were part of the bonds then acquired (reflected in the bonds' basis at that time) and the bonds were not wholly retired until these coupons were paid. This position is consistent with the basic theory of the Campbell and Rickaby decisions. See, also, Clyde C. Pierce Corp. v. Commissioner, supra, 120 F.2d 206, 208 (C.A.5, 1941)
 
 
 
 17
 WHITAKER, Judge (dissenting).
 
 
 18
 I have great respect for my brethren on this court, for their learning in the law, for their impartiality, for their judicial acumen, but, after all, in common with all mankind, they are not infallible, as I think the majority opinion demonstrates.
 
 
 19
 I disagree with the opening sentence of the majority opinion: I do not think the war loss provisions of the 1939 and 1954 Internal Revenue Codes have anything to do with this case. What we are concerned with here is not the debt owed plaintiffs at the outbreak of the war, but the interest that accumulated on that debt during the war. The war loss provisions were not concerned with this interest. These provisions permitted a deduction of the debt as it existed at the outbreak of war and prescribed how, after the war was over, taxable income should be computed on any recovery of the debt deducted. It had nothing to say of income accrued in the interim and paid after the war.
 
 
 20
 So long as the war lasted there were, of course, no payments of interest on the bonds owned by plaintiffs nor any payments of principal thereon, but, of course, the taxpayers continued to hold them until the war was over, although, for income tax purposes, they deducted from their income a portion of the cost of the bonds, as securities on property seized or destroyed by the enemy, as they were entitled to do under section 127 of the Internal Revenue Code of 1939.
 
 
 21
 During the war there was no trading in these bonds, but in 1948 trading in the Italian bonds was resumed, and in 1950 trading in the Japanese bonds was resumed. To each of the Japanese bonds there were attached coupons for interest. Of course, none of those that had matured during the war had been paid when trading was resumed, but later they were honored and paid.
 
 
 22
 The taxpayers included the amount paid on the coupons in default in their income tax returns for the years in which payments were received, as ordinary income. Later, however, they filed claims for refund on the theory that the amounts received were not ordinary income nor were they income at all, but a return of capital.
 
 
 23
 The issue is a very simple one under the facts of this case. It is simply a case of a creditor holding bonds on which the debtor defaulted but which he later honored and redeemed. When default on the Japanese bonds occurred, the creditor could take no action against the debtor; he could only hold them and hope they would be honored later, in whole or in part. This is just what happened. They were honored later and the coupons in default were paid in full.
 
 
 24
 As the case has been stated, there can be no doubt that the payments on the defaulted coupons were payments of interest and returnable as ordinary income.
 
 
 25
 The fact that the taxpayers deducted from their income a portion of the cost of the bonds, for income tax purposes, makes no difference. This was vis a vis the taxpayers and the United States Government; it had no effect on the creditor-debtor relationship. The debtor was still liable on the bonds and on the coupons attached to them according to the tenor of them and remained so liable, except that, by agreement after the war, the time for payment of them was extended for 10 years.[8] Hence, when a defaulted coupon was paid, interest on the bonds was paid exactly as if it had been paid when the coupon matured, and in each case the taxpayers are required to report the interest received as ordinary income.
 
 
 26
 The case becomes complicated only when taxpayers seek to have their liability determined as if they had purchased the bonds on the date trading in them was resumed. This is the injection of a hypothesis contrary to the facts in this case. Taxpayers did not purchase their bonds; they already had them, and their liability must be determined on this basis. The war loss provisions treated the bonds as having been destroyed only for the purpose of the tax deduction and the computation of income resulting from the recovery upon them. The Congress knew taxpayers would hold on to their bonds and that interest would accrue in the interim, but as to this interest, no change in the law was made. Everyone, I assume, would agree that under the law prior to the enactment of war loss provisions, taxpayers would be taxable on the income on the bonds when they received it.
 
 
 27
 What taxpayers are seeking to do in this case is to convert what was interest before the war into principal after the war. This cannot be done, as was held by the District Court for the Southern District of Ohio and the Court of Appeals of the 6th Circuit in Shafer v. United States, 204 F.Supp. 473 (1962), aff'd 312 F.2d 747 (1963). That case also involved coupons on Japanese bonds in default during the war, but later honored and paid. The only difference between that case and this one is that the taxpayer in Shafer sold the defaulted coupons, but it was held that the amount he received for them was ordinary income to him. It necessarily follows that a taxpayer, who holds on to his bonds and himself receives payment of the coupons in default, must report the receipt as ordinary income.
 
 
 28
 Before the war these Japanese bonds held by plaintiffs represented a capital asset in their hands, and the coupons attached thereto evidenced their right to receive a certain amount of income on this capital asset. The character of the bonds and the coupons never lost their identity; they remained principal, on the one hand, and income, on the other. The same is true of corporate bonds in default: what was principal before the default was principal thereafter, and what was income before was income thereafter. This was recognized in Fisher v. Commissioner, 209 F.2d 513 (6th Cir. 1954), the court holding that the holder of corporate bonds in default who sold them "flat" was obliged to apportion the sales price between the principal of the bonds and the coupons attached to them, and that he was obliged to report as ordinary income the amount received for the coupons.
 
 
 29
 The taxpayer in United States v. Langston, 308 F.2d 729 (5th Cir. 1962), differed from the taxpayers here in that he was not the holder but the purchaser of bonds. He had purchased bonds on which the interest coupons were in default at a "flat" price and later sold them "flat." The decision, however, is in point in its treatment of income accrued on the bonds during the period the taxpayer held them but which was not paid before he sold them. Relying on the decision in Fisher, the court held that, while receipts of interest income during the holding period on account of coupons that had matured prior to purchase were a return of capital, the taxpayer must allocate the price he received for the bonds between the interest coupons that had matured prior to his purchase (together with the principal of the bonds) and interest coupons that matured during the time he held the bonds. As to the latter, the taxpayer must treat his receipts as ordinary income.
 
 
 30
 On the identical facts that were present in the Langston case, the Second Circuit agreed fully with the Fifth Circuit's disposition of it. In Jaglom v. Commissioner, 303 F.2d 847 (2d Cir. 1962), the court held that that portion of the proceeds from the "flat" sale of defaulted bonds which is allocable to interest accrued while the taxpayer held the bonds is taxable as ordinary income. "A distinction has arisen," the court said, "between an income producing capital asset and the income which it produces. Gains arising from the sale of such an asset which has appreciated in value are capital gains, but gains flowing from the sale of an accrued right to collect the income from such an asset are not. Thus the right to collect ordinary income is not transmuted into capital gain by its sale." Id., 303 F.2d at 848. The court also relied on the fact that since the purchaser could treat interest payments that accrued while the taxpayer held the bond as a return of capital, these interest payments would never be taxed as ordinary income unless they were so taxed to the taxpayer. This payment to him represented, in part, compensation for his having held the bonds for a period of time and thus was money paid for the use of money and ordinary interest income.
 
 
 31
 See also Commissioner v. First State Bank, 168 F.2d 1004, 7 A.L.R.2d 738 (5th Cir. 1948).
 
 
 32
 If plaintiffs had sold their bonds after the war at the "flat" price, the purchasers would have paid no income tax on the transaction until after they sold them. When they sold them their income would have been the difference between the "flat" price they paid for them and what they got for them. But plaintiffs, if they had sold the bonds at the "flat" price, would have sold not only their principal but also what was income to them. On the authority of the above cases, they would have had to allocate the "flat" price they received between principal and income. If plaintiffs paid no tax on what necessarily was income, no tax on it would be paid by anyone.
 
 
 33
 It is not possible to determine plaintiffs' tax liability as if they were the purchasers of bonds. The basis for taxation of the seller and the purchaser is entirely different; one can not be equated with the other.
 
 
 34
 That the bonds, for which taxpayers claimed a war loss deduction, took on a new basis when they reacquired value is of no moment in the determination of tax liability arising from the payment of the coupons in default. It is of importance only when the taxpayers dispose of them. Then their gain or loss is measured by the difference between the new basis and the price for which sold. The acquisition of a new basis certainly does not transform a holder of bonds into a purchaser of what he already had. Taxpayers' liability is that of the holder of bonds previously in default but later honored and redeemed.
 
 
 35
 I am of the opinion plaintiffs are taxable on amounts received on coupons in default when they agreed to the proposal for an extension of time for payment of bonds and coupons, as ordinary income, and, hence, that their claims for refund were properly disallowed.
 
 
 
 Notes:
 
 
 [8]
 Section 127(c) of the Internal Revenue Code has no application to the issue presented in this case. The amount of the recovery on the bonds was less than the unused portion of the allowable war loss deduction, and, hence, taxpayers had no income arising from their recovery of value